**SHATTERPROOF GLASS CORPORATION, Plaintiff,**

v.

**GUARDIAN GLASS COMPANY, Inc., and Guardian Industries, Inc., Defendants.**

**Civ. A. No. 26544.**

United States District Court,
E. D. Michigan, S. D.
Dec. 7, 1970.

Bernard J. Cantor, Richard Grauer of Cullen, Settle, Sloman & Cantor, Detroit, Mich., for defendants.

William C. McCoy, Jr., of McCoy, Greene & Howell, Cleveland, Ohio, for plaintiff.

## OPINION

TALBOT SMITH, District Judge.

This case concerns the bending of glass for, principally, automobile windshields. The litigants are suppliers of replacement windshields, not original equipment suppliers. For a while, years ago, all that was needed for a windshield was a pair of flat pieces of glass. One piece comprised the left side of the windshield, the other the right. In the middle was a divider strip of some kind. Then in the early 1950's all of this changed. We began to get "panoramic" windshields, "wrap-around" windshields, which were bent pieces of glass, now common on cars. They are laminated, there being a sheet of plastic sandwiched between two pieces of glass.

The bending is simplicity itself in theory, though in practice difficulties arising from the process operations are experienced. The general idea is that the two pieces of flat glass, one slightly larger than the other, are put on a frame, or mold. As seen by the simplified sketch, this frame is made up of three sections,

[A3634]

a center section, and two symmetrical end sections, one left, the other right. These sections are hinged so they can bend, either upwards to support the flat pieces of glass (their position at the outset) or downwards, to support the bent pieces of glass at the finish of the operation. At the start of the operation these sections are so disposed that six parts thereof support the flat glass. The frame, with its glass load is started through a furnace. As the glass heats up and softens it sags and sinks into the mold which, by means of its hinges, bends and receives it. We thus end up with bent pieces of glass. If, as we noted, we take two of these pieces of bent glass and make up a sandwich, with a piece of plastic in between, we have today's laminated wrap-around windshields. Our problems in this action relate to the molds on which the bending

takes place, and more particularly to such things as hinges, pivots, and points of support. In addition, the plaintiff claims that the defendant misappropriated 43 of its trade secrets.

The Jendrisak patent-in-suit, 3,103,430, issued on September 10, 1963, relates to a hinged bending mold. The application had been filed on August 6, 1958 as a continuation in part of a patent application filed March 1, 1956. In controversy here are Claims 1, 3 and 7. Claims 1 and 3 cover the construction of a specific type of a glass bending mold, or fixture, utilizing a six-point support, two points at the ends and four points intermediate the ends, at the hinges. Claim 3 is dependent upon Claim 1 and describes a species of the invention wherein the four support points are at the end of the center section rails rather than being at the ends of the end section rails. (The two ends of the two center section rails rise up above the ends of the end section rails and provide four points of support.) It is clear that if Claim 1 is infringed, then Claim 3 is also infringed. There are no arguments directed towards non-infringement of Claim 3 per se.

We turn first to the validity of Claims 1 and 3 of the Jendrisak patent, bearing in mind that under the teachings of Graham v. John Deere, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), we are to look not only to the scope and content of the prior art, but at the differences between the prior art and the claims here at issue. We will look, as well, at the level of ordinary skill in the pertinent art and, as *Graham* puts it, "against this background" determine the obviousness, if such there be, of the subject matter.

The precise terms employed in Claims 1 and 3 are set forth in the patent, but we are aided in our interpretation by the testimony of the patentee Jendrisak as to just what he thought he had invented and accomplished. As to Claim 1, when asked what he believed he had invented he replied that it was "the 6-point support". (These are the support points

for the panes of glass as they lie on the mold.) With respect to Claim 3 he testified that it was the "hinging in Claim 3 that the center section points when opened become higher than the end sections of the mold to receive the glass". In summary then, Jendrisak conceded that both Claim 1 and Claim 3 relate to a mold having hinged end sections and having a 6-point support. These references to a 6-point support were used constantly throughout the trial. Plaintiff itself states that this is a "shorthand term for the invention of the patent in suit" but points out as well that it is not a comprehensive definition thereof. For our purposes also it will serve as a convenient designation. Actually, we think it fair to say that the six-point designation of the invention is perfectly consistent with Jendrisak's earlier Libby-Owens-Ford owned patents, 2,774,189, and 3,094,403, which we are satisfied from the record, disclose everything called for by the claims in controversy, numbers one and three, with the sole exception of the 6-point support.

The hurdle that plaintiff must surmount as respects the patent is a mold used at the Ford Motor Company for many years. We have placed considerable reliance upon the testimony of the Ford engineers because the intense self-interest of the litigants in this matter has led us into a profusion of minor issues, sub-issues, and collateral issues, which have prolonged both the trial and the briefing of the case.

Mr. Laginess is at this time Ford's manager in charge of design and construction of tools for producing windshields. He testified that he has designed all of the fixtures used by Ford for bending windshields (with one exception) since 1950. It was his testimony that he, himself, had designed the mold for the first windshield used by the Ford Motor Company involving a bent piece of glass as well as the later molds for what we now call "wrap around" or "panoramic" windshields used on the 1955–1956 Ford and Mercury cars.

In the month of July, 1954 (which is about 20 months prior to the filing of the patent-in-suit) the Ford mold was put into commercial operation. Mr. Laginess testified that he began the design of the fixture in late 1953 and completed it in April of 1954, that he saw such molds being constructed, checked out their operation, and saw them in actual production use for bending windshields in July, 1954 at Ford's Dearborn Glass Plant.[1]

Mr. Oscar Neff who was Supervisor of the Production Programs and Scheduling for the Ford Glass Division during the period in question furnished additional corroboration of the use of these molds. Mr. Neff was responsible for the maintenance of records of windshield shipments from the Dearborn Glass Plant and he testified from records showing shipments of several thousand of the windshields so constructed. Thus, some 80,000 were shipped in January, 1955, more than a year prior to the filing of the patent-in-suit. It is our finding in this respect that the record established beyond any question the commercial use of the Ford mold for making 1955 Ford and Mercury windshields commencing in approximately July of 1954.

We were given a detailed explanation by Mr. Laginess of the construction and operation of the Ford mold and there is no doubt in the Court's judgment that the 6-point concept is present in the Ford mold.[2] Mr. Jendrisak, in fact, so conceded upon cross-examination.

Q. Does the Ford mold have six-point support?

A. Yes.

Q. And where are those six points?

A. Obviously at the ends of the center section.

Q. Do you admit that the Ford mold shows the invention that you described before, namely, a mold with six-point support?

[Objection omitted]

A. Yes.

* * * * * *

Q. Do you agree with me now that that idea of a six-point support on a bending mold was already old, by the time you made what you thought was your invention?

A. It appears that, yes.

Present, also, in the same Ford mold are the other essential structural features called for by Claims 1 and 3 of the patent-in-suit and in the very combination that the plaintiff asserts, for his patent, is novel, is "put together in a new way".

■ Notwithstanding, however, the above admissions on the part of patentee Jendrisak, he nevertheless vigorously contends that the Ford Motor Company "does not anticipate Claims 1 and 3 of the patent-in-suit". We will examine plaintiff's arguments in some detail, against the background of the well established principle that it is the claims rather than the specifications that are the measure of the invention in issue. Kaiser Industries v. McLouth Steel, 400 F.2d 36, 49 (CA6, 1968).

Plaintiff emphasizes that one of the end sections on the Ford mold rotates about a fixed pivot rather than on a swinging-link pivot. (This latter type is used at the other end of the Ford mold and on both ends of the patent-in-suit.) Plaintiff then goes on to contend that such end-section is not mounted "to swing vertically" as is plaintiff's in Claim 1. This distinction is utterly without merit. An end section may have a vertical swing whether it employs a fixed or a link pivot, as the exhibits and models before us clearly demonstrate. There is clearly nothing in Claim 1 either precluding a fixed pivot or requiring a swinging pivot. To argue, as plaintiff does, that the Ford end section does not swing vertically is directly contrary, also, to the testimony of Mr. Mc-

---

1. Defendants' Exhibits S-4 and S-5 are dated drawings of the mold in question.

2. This mold was not among the prior art considered by the Patent Office examiner.

Kelvey, plaintiff's Manager of Research and Development, who testified that the end sections of the Ford mold are "pivotally movable for movement up and down." It is our finding that both end sections of the Ford mold do, in fact "swing vertically" as required by Claim 1.

While on the subject of movement, we will consider another of plaintiff's attempted differentiations with the Ford mold, namely, that the center section of the Ford mold has "a significant lateral movement" and does not move vertically as is required by Claim 1. The vertical movement of the center section of the Ford mold is clear not only from our study of the construction of the mold itself but from the testimony of Mr. Laginess of Ford who, when asked whether or not the center section moved up and down during the operation of the mold replied "Yes, sir, it's carried up and down by the movement of the wing sections." This was also substantially Mr. Jendrisak's admission when asked if the Ford center section did not "connect with the end sections 'for vertical movement therewith'." His reply was that it did. As to plaintiff's claim of "significant lateral movement" in the center section, we find nothing significant about this movement. It is composed of "component forces and vector forces that go off to the side somewhere. I [Jendrisak] can't tell you where exactly, but they're not vertical * * *".

The contentions that the Ford mold center section has a significant lateral movement and does not move vertically is not supported in the record.

Plaintiff next urges that the axes about which the Ford end sections swing are not parallel, as required by Claim 1. There was a slight convergence of axes in the Ford mold. The significance, or lack thereof, of parallelism was described by Mr. Laginess, the designer of the Ford mold, as follows:

"Q. What determines, in the design of a fixture, whether the hinge axes are designed parallel to each other?

"A. It's a geometrical problem of the shape of the windshields, along with the choice of where you are going to put the hinge points." (Tr. 325)

Whether these axes are parallel or nonparallel, the witness further testified, had "no effect at all on the mechanical operation of the fixture." Actually, as Mr. Jendrisak himself made clear in his own prior patent, the axis arrangement is dictated by the bend desired in the shape of the windshield.[3] "If such shape is substantially cylindrical, the axes of the hinges and supporting rods are parallel. If the glass has curved sections that tend toward a modified conical form, the hinge lines and supporting rods 24 must be reoriented to remain generally parallel to elements of the desired conical surface."[4] Finally, Mr. Jendrisak admitted on cross-examination that the arrangement of the axes was not inventive.

"Q. Are you trying to say that the arrangement of the axes in a parallel form is an inventive addition to claim 1?"

The witness replied, "No, I am not trying to say that",[5] nor can the court. The defendants urge that there is thus no basis for patentability predicated upon the parallelism of these axes, with which we are in agreement and so find.

Plaintiff asserts, also, that the Ford mold differs from its mold because the Ford mold has a slight tilt, possibly ⅜th of an inch in a two-foot span, whereas the patent claim requires horizontal support. The question here is the meaning to be attached to the word "horizontal". Does it mean horizontal to a physicist, or to a mold builder?

3. Patent No. 2,551,607 of 1951.

4. Tr. 1504–5.

5. Tr. 1505.

Horizontal in the laboratory or in the shop? The question was answered by Mr. Jendrisak himself. He was asked, "Now, if you saw a Guardian mold such as, for example, Exhibits 54 or 47, which your company has contended infringed Claim 1, and upon careful examination of that mold you discovered that there was a three-eighths inch slope of the glass on that mold, would you then believe that the mold is within the embrace of the description of the mold of horizontal?" His answer was "Let me think —if it were three-eighths, well, it would be within the embrace, but it would not be exactly horizontal". It seems clear that both Mr. Jendrisak and his counsel admitted that a mold with such a slight tilt would infringe Claim 1, that it would still be "horizontal", which we think is the practical and intended meaning of the word. Obviously, then, the Ford mold cannot be differentiated on this ground. There are occasions when because of the size or shape of the glass there has to be some tipping of the mold but it is more desirable to maintain the glass in a horizontal plane to help keep it from slipping off the mold. There is no patentable significance to presence or absence of a slight tilt in the molds before us, particularly in the claimed invention, and we conclude that the Ford mold supported the glass in a "horizontal" plane within the meaning of Claim 1.

We next consider plaintiff's final attempted differentiation of the Ford mold from the Jendrisak invention, namely, that the Ford mold was a "thrust" mold, and not a "gravity bending" mold. The difference between these two molds is, in general terms, this: The thrust mold utilizes a thrust, or push, at each end of the mold to help along the sagging glass. It really creates a buckling effect. The gravity mold does nothing to push the ends, or buckle. The glass sags with the heat due to the force of gravity and the mold really goes "along for the ride."

Defendant argues with some justification that even in the thrust mold the force of gravity is really the predominating factor, since in the thrust mold the thrust itself is applied by a gravity operated linkage. Thus both are, it is argued, gravity (operated) molds.

But the claims in suit do not mention the matter of thrust. In the preamble to Claim 1 we find only "A collapsible mold for forming curved glass panels by *gravity* bending thereof while heated * * *". [Emphasis supplied.] There is no reference here to thrust or its use or application. Moreover, Mr. Laginess testified that in the Ford mold movement from the open to the closed position was caused by "gravity, along with the preset operation or weight of the fixture, the direction you want it moving, along with heat." It is significant on the matter of thrust that the stop at the end of the molds merely contacted the top of the glass ("when you loaded the glass, the top was in contact, when you loaded", testified Mr. Laginess) rather than exerting pressure on the edges of the glass for a buckling effect. The Ford mold cannot fairly be called a "thrust" mold. Actually, there are no significant differences in the functioning of the Ford and Jendrisak molds. In both the basic theory is that the glass, rather than the mold, is the controlling factor in the bending operation. Mr. Jendrisak stated that " * * * actually the glass is the controlling factor. It is the part that dictates what the mold should do at its response," whereas, speaking of the Ford mold, Mr. Laginess said in part "Our objective would be to bend the glass with heat and simply let the fixture go along for the ride". It is our conclusion that the inventions of Claims 1 and 3 demonstrate no patentable departure from the Ford molds.

At this point, in our consideration of the Ford mold, we should advert to Mr. Jendrisak's own description of his concept of the invention, in somewhat more detail, as was illustrated by certain of his testimony.

"Q. Mr. Jendrisak, with respect to Claim 1 of the patent-in-suit,

what did you believe you had invented? [Objection made and overruled]

"A. The six-point support.

"Q. A six-point support mold?

"A. Right.

"Q. That is what you believed you invented?

"A. Yes.

"Q. Is that also true with respect to Claim 3 of the patent-in-suit? [Colloquy omitted].

"A. Again, the offset or the—in other words, hinging in Claim 3, so that the center section points, which opened become higher than the end sections of the mold to receive the glass.

"Q. All right. Then it is fair to say that both Claim 1 and Claim 3 relate to what you believe to be your invention, namely, a mold having hinged end sections and having a six-point support?

"A. That's right." (Tr. 486–87)

In order to appreciate the significance of the above admissions, their background must be reviewed. Mr. Jendrisak had earlier obtained Libby-Owens-Ford patents 2,774,189 [6] and 3,094,403.[7] These patents showed all the significant features disclosed in the patent-in-suit with the exception of the six-point support feature. The plaintiff protests in its briefs that "Jendrisak's own copending patents cannot be used as references against him", that they are clearly not "prior publications". Whether they are or not (Cf. Hazeltine Research v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed. 2d 304 (1965)) is not the issue at this point. Here we are looking at the scope of the invention, at just what is claimed to be the invention of Claims 1 and 3, a matter of delineation of boundaries. On this question the earlier patents of Mr. Jendrisak are illuminating. They reveal, as we noted, everything of significance in the later patent save and except

the six-point support. Claims 1 and 3 claim the invention to be that of the addition of six-point support to the earlier Libby-Owens-Ford molds. This was also Mr. Jendrisak's trial testimony, quoted above.

But the six-point support concept is not limited to this earlier Ford mold. As the windshields got heavier and larger in the early 1950's other mold designers had employed six-points of support to prevent premature sagging. The patents of Golightly (2,876,595), Black (3,-248,201) and Carson (3,089,319, using separate arms) all illustrate and employ this feature. These patents must be considered along with the previously described Ford mold. Golightly is particularly in point, the 6-points of support being precisely those of Claims 1 and 3. Plaintiff argues the inapplicability of these patents upon grounds that do not, in our judgment, impeach their significance for our purposes. Thus it is pointed out that Golightly has a fixed center section and counterweights. But it also has Jendrisak's crucial six-point support. It is argued, as well, that the Ford use was not a prior public use because, in substance, it was not accessible to the public. "No effort," argues the plaintiff in its Reply Brief, "was made to show that anyone other than Hertzberg ever saw its bending molds or that the general public could wander in and out of the Ford plant at will, an amazing concept to a Detroiter."

■ Plaintiff misconceives the law on this point. The Supreme Court did no more than enunciate the common sense of the industrial age when it held in Electric Storage Battery v. Shimadzu, 307 U.S. 5, 20, 59 S.Ct. 675, 684, 83 L.Ed. 1071 (1939) that

"The ordinary use of a machine or the practice of a process in a factory in the usual course of producing articles for commercial purposes is a public use."

6. Def.Ex. A., Tab. 24.

7. See, Def.Ex. A., Tab. 37.

■ The Ford Motor Company commenced the use of its mold in July of 1954 (Jendrisak's filing date was approximately a year and a half later, on March 1, 1956) and shipped out over a million of them. This is beyond question a prior public use under the law. And it is clear, as well, that a prior public use invalidates a later filed patent, whether the use is identical (or substantially identical) to, or an obvious variation of the patent claim. Tool Research and Engineering Corp. v. Honcor, 367 F. 2d 449, 453–454 (CA 9, 1966), citing International Tooth-Crown Co. v. Gaylord, 140 U.S. 55, 11 S.Ct. 716, 35 L.Ed. 347 (1891) and Smith & Griggs v. Sprague, 123 U.S. 249, 265, 8 S.Ct. 122, 31 L.Ed. 141 (1887). The case of FMC Corporation v. F. E. Myers & Bros. Co., 384 F.2d 4 (CA 6, 1967) cited by plaintiff relates to a totally different issue, an inventor's secret and private use rather than a commercial public use.

■ Plaintiff urges that it has combined various elements in a novel way (and that all defendants have done is to pick them apart) but this is not the situation. What Jendrisak claims to have invented, the "six-point support", was in previous use by mold designers and there was no novel coaction, nor was there any unexpected result created, through or by the addition of a six-point support as the glass got heavier and larger. It was an obvious, inevitable step. Even without consideration of the Ford mold, Claims 1 and 3 are invalid as obvious. Anderson's Black Rock v. Pavement Salvage, 396 U. S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258. The other claimed new mold features are not new in the glass bending art. They concern, in addition to the six-point support feature, an assertion as new of two identical end sections mounted on "suspended" pivoted links (not so claimed), a center section moving only vertically, no counterweights (not claimed), no massive sections (not claimed), a mold for bending two panes rather than only one for the back window (the claims make no such distinction), an annealing rather than a tempering mold (again the claims set up no such distinction), parallel axes, horizontal flat glass, and "gravity" versus "thrust" molds. Where the testimony warrants or forms any foundation for discussion we have considered each feature in detail herein. Those not analyzed in detail are either old, absent from the claims-in-suit, or both. We find that the bending mold of Claims 1 and 3 was obvious in view of the prior art.

As to infringement of Claims 1 and 3 by defendants, we heard much testimony relating to that portion of Claim 1 stating in part "said glass engaging members having end faces that abut at the ends of the center section". The word "abut" is ambiguous. It may mean either "to touch" or to "border on".[8] The patent, however, describes (Col. 5, lines 41–45) an end face (23) which "engages" another, thus clarifying the meaning for this purpose. The Guardian mold end faces do not touch or engage one another. In fact, a paper match-cover in its closed position can be inserted between them, as was demonstrated at trial. Although Guardian thus does not literally infringe, nevertheless, where equivalent means function in an equivalent manner to produce the same result there is infringement. The purpose of the abutment of the rails is to prevent overbending. A positive stop is employed by the above-described engagement. Defendant employs for this purpose not a rail stop, or a hinge stop, but an arm which strikes a bolt, thus preventing further movement. We find that this is merely an equivalent. It is, we note also, substantially equivalent to the Ford mold, which employed a stop screw threaded into the base of the fixture for this purpose, Ford also having a gap between the rails. Under the doctrine of equivalents there is thus infringement here. But there is no validity as to these claims, not only in view of the prior art Ford mold but also, both

8. Webster's Third New International Dictionary (1968).

as to hinge-type and abutting end-rail stops, in Jendrisak's prior art patents, 2,737,758; 3,094,403 and 2,551,607.

Claim 7 involves what is called a "hold down clamp". We have seen that the glass sinks into the mold during its passage through the furnace and conforms to the shape of the mold. But there is, under some circumstances, a too-great curling ("overbending") of the tip ends of the glass in the final stages of the operation. Whether a hold-down was necessary or not depended in part upon the furnace design. "For example," it was asked, "at Pittsburgh Plate Glass you were able to bend certain members without hold-downs, whereas at Shatterproof the same member has to be bent with a hold-down?" To which the answer was in the affirmative. At Shatterproof, it was testified, "they used gas pots to heat the glass at that particular point to make it more pliable and hold-ons to keep it down."

██ The inventive concept of the Jendrisak hold-down was its reversing feature. "Is it a fair summary, then, to say that your [Jendrisak's] invention was a hold-down which had a means to move the clamp partway from the glass when the mold was open and to reverse and move the clamp into contact with the glass when the mold was closed?" To which Mr. Jendrisak replied, "That is correct." This testimony is consistent with Mr. Jendrisak's representation to the Patent Office at the time of an interference proceeding, in the file-wrapper of the patent-in-suit, and in the specifications thereof.[9] It is clear, however, from the testimony and the exhibits that the defendant's mold, on the contrary, has no hold-down employing the reversing feature. The defendants' furnace, a later model than plaintiff's, made a reversing type hold-down unnecessary. Guardian's hold-down is in contact with the glass at all times. It is our finding that Claim 7 was not infringed by the defendants. The reversing feature of Claim 7 was not shown to be used by the defendants.

We might add, to round out our examination of this hold-down operation, that we are now in what we would describe as the field of balance and counterbalance, in which various results (of balance, or lack thereof) may be attained by a shifting back and forth of weights, or of using different pivots for the same weights. This is all ancient learning. It was Archimedes who is reported to have said, "Give me a place to stand and I will move the earth."[10] An example in the exhibits before us is that of the Nylander patent,[10a] No. 1,799,526, utilizing a movable counterweight for applying continuous clamping pressure to a vise. The whole glass bending art is replete with weighted and counterweighted hold-downs. It is not a precise art. Actually, we are in the area of "just old-fashioned blacksmiths". (Tr. 1205) It is a trial and error operation, substantially empirical. Such testimony as "We don't have any drawings" [of molds], that no computers are used, that "we don't pay any attention to the fact that it's got to be absolutely horizontal" and so forth, gives a picture of the art far removed from the laboratory of the scientist. In this area, a shifting of weights to effect counterbalance in a hold-down is within the province of any skilled mold designer. We therefore find that the hold-down on Claim 7 is an obvious device to effect an improvement over prior art weighted hold-downs, made necessary by Shatterproof's unique problem.

We will now consider the alleged theft of trade secrets. Basic, of course, to the whole concept of trade secrets is secrecy itself. At the very outset of our consid-

9. See Tr. 1348–61, 1448–55, and Plaintiff's Ex. 1, Col. 8, lines 36–54, respectively.

10. The report goes on that when Hiero II demanded proof of this, Archimedes rigged up a mechanical device by which the king, himself, was able to move a large and fully laden ship. See, generally, the Britannica (1963) and references therein.

10a. Defendants' Ex. A.

eration of this problem, it is stressed to us, and properly so, that the plaintiff's business, concerning which it makes broad claims of secrecy, was not an original-equipment business but a replacement business. What it did was merely to duplicate (for, say, a motorist whose windshield had been broken) windshields for the replacement market. The windshields themselves (the broken ones, that is, that are to be replaced by replacement companies, such as Guardian and Shatterproof) had already been produced by the original equipment manufacturers, and had been supplied to the replacement companies with molds and specifications. In addition, it is clear that those skilled in the art are able to tell from an examination of a windshield a great deal about it, such as the hinge points, whether a hold-down was used, or whether it was "bent to size or whether it was bent block size and cut after."

Thus, secrecy in this context of mere replacement is a concept of dubious application and the plaintiff's efforts to bolster it were singularly unpersuasive to the court. So far as secrecy at Shatterproof is concerned, there is a mass of testimony as to who was shown what, and when, of movies made and distributed, of visitors tours, of the routes they took, and what they could see and could not. Mr. Chase testified that starting prior to the early 1950's, various customers, i. e., dealers and distributors and others, undefined, were shown through the plant and through the bending operations. He also testified that there were two routes, a security route and a non-security route, but the course of each was never defined to us, although it was admitted that the so-called "security route" included the bending furnace, with molds going in and out. So far as the molds (testimony as to which comprises a substantial part of this case) are concerned, plant visitors, strangers to the moldmaker, Mr. Kapron, were allowed to watch him build molds in the shop. The most detailed explanation of the plant situation was provided by deposition witness Brown, who had been plaintiff's Assistant Sales Manager and who worked there from 1950 to January of 1958. He describes in detail plant tours encompassing raw glass storage, cutting, mold making, bending, washing, assembling, laminating, inspecting and packing operations, taking place during 1954 and 1955. The purpose of these tours, inaugurated to their fullest extent in 1954, was to demonstrate "what Shatterproof is doing, see the inspection stations, all the operations, it would be most helpful in handling quality complaints * * * ". There was no pledge of secrecy exacted and the only operation concealed was "the pre-press operation which was covered up because Shatterproof felt it was too crude." These tours were made with the knowledge of both Mr. Chase, President of Shatterproof, and Mr. Jendrisak.

Finally, the whole idea of secrecy is colored by nature of the business, which, as we have noted, is a replacement business, wherein original equipment (to be replaced, if broken) is supplied to the replacement companies, along with models and specifications, from which those skilled in the art are able to deduce much information about it. Although there is enormous disagreement in this area, we are satisfied, and find, that any formerly imposed restrictions on the viewing of its bending operations were abandoned by or at the time of the fall 1954 sales meeting at its plant, which was more than a year prior to the alleged theft of the secret information. Thereafter there was permitted viewing and observation utterly inconsistent with any preservation of secrecy.

Equally inimical to plaintiff's trade secrets theory, moreover, is the situation with respect to the two alleged thieves, Little and Kapron. It is plaintiff's theory that it was through these men that the defendant "misappropriated" the trade secrets of Shatterproof. These men, we note at the outset, were not supervisors or even foremen. They were hourly rated employees, Little's pay being $2.75 per hour. Both were mold makers. (There were about a dozen men at Shatterproof whose trade was mold

making.) Neither man was told or warned that his work involved proprietary or confidential matter, nor did they so understand, save with respect to non-production, experimental items. The Jendrisak testimony is revealing on this point. He knew when both Little and Kapron left that they were going to Guardian, to practice their trade in Guardian's bending operation, just as, Mr. Jendrisak admitted, he had some time back left Libbey-Owens Ford to go to Shatterproof to practice his profession or trade. At no time did he warn them that so-and-so were trade secrets, or ask them not to use them. "Did you feel," he was asked, "that either one of them were betraying you in some way?" The answer was, "Well, I don't know how I felt at the time; I felt we were losing good men, particularly Harvey Little. I certainly felt that." (Mr. Jendrisak later re-hired Mr. Kapron.) At no time had he ever accused either man of stealing trade secrets from him, nor did he ever contact and warn Guardian of a trade secret situation. The plaintiff has failed to establish the existence of any confidential relationship between it and Little and Kapron.

Plaintiff urges to us that the law, in this situation, as to these hourly rated workers "infers a confidential relationship in the same way that a client coming to a lawyer infers that the lawyer will not abuse the confidence reposed with him." The analogy is not apt. Its application to this situation would seriously impinge upon the doctrine of freedom of choice as to work and trade, and its inevitable result would be deleterious in the extreme to industrial labor, a binding workman to the particular employer for whom he originally worked in a modest, hourly-rated capacity. We are constrained to reject the argument made.

Nor do the circumstances of their hiring suggest that the defendant knew of any such relationship or participated in the breach thereof. Defendant's Vice-President Hertzberg testified that Little called him on the telephone and asked for employment, bringing Kapron with him.

They were hired as fixture makers, mold makers, which Guardian required, as do all companies similarly situated. "Ford had fixture makers and mold makers. Libby-Owens had them, Pittsburgh had them. And it was a trade, as far as I was concerned. I would have advertised under ordinary circumstances had they not approached me."

From all of the testimony on this matter, *pro* and *con*, we find nothing sinister, nothing of misappropriation. This is merely life in today's industrial world, employees coming and going, bettering themselves where they can. Shatterproof itself had hired both engineering and management personnel from Libby-Owens-Ford and Pittsburgh, when it went into the glass bending business in 1952. We are not, of course, hinting at any impropriety, but speaking rather, of trade practices. It is our conclusion and our finding that there was no confidential relationship with Little and Kapron, no breach thereof, and neither irregularity nor impropriety in their hiring by Guardian.

■ Having concluded that there was no secrecy here, no confidential relationship, and no breach thereof, it is probably an exercise in redundance to proceed now to determine if each of the alleged trade secrets was in fact a trade secret susceptible of misappropriation. However, we heard the testimony at some length, it has been fully briefed by the parties, and in the interests of completeness of the opinion we will rule thereon, but we will burden this opinion only with analysis of what we regard as essential and illustrative items.

At the very outset a controversy exists over just how many trade secrets are involved. This controversy has been with the case since its inception, has been the subject of conferences, discovery, and trial argument, and remains with the case today. It arises over the enumeration and description of those items that should properly be considered as comprehended within the expression "trade secret". The plaintiff asserts that it is claiming only four. The de-

fendants assert that they really claim forty-three. The reasons for the discrepancy are readily apparent. Thus the plaintiff asserts that its first trade secret, is "No. 1 Trade Secret—Mold". There follow six typewritten pages (see Defs' Ex. B) starting with the words *"One trade secret relevant to the Jendrisak mold was where to cut and hinge the parts of the skeleton mold and how to hinge the parts together* so that the parts of the molding surface of the center section and parts of the molding surface of the end sections would be so coordinated * * * *" as to effect a certain result. [Emphasis the Court's]. The defendants, properly in our judgment, broke down the above-quoted allegation (merely the first paragraph describing the "mold" trade secrets) into its material components, the phrases underlined above. The plaintiff's description of the "mold" trade secret continues in like manner, interspersed throughout with such expressions as "Another part of plaintiff's trade secret was * * *", "Another part of the trade secret relevant to the mold was * * *", "This also was a new and important part of plaintiff's trade secret", "It was a trade secret to so position shielding * * *", and "An additional trade secret relevant to the use of the mold was * * *". What the plaintiff has done here is to lump together a series of alleged trade secrets (pertaining to the mold) into one comprehensive overall trade secret, described as "mold". The plaintiff describes defendants' breakdown of the overall "trade secret—mold" into its component parts as mutilation hereof, but the characterization is hardly apt when plaintiff itself has subdivided as described into "parts". Moreover, to add to the confusion about the identification of the trade secrets, on the fifth day of trial plaintiff tendered a list of trade secrets with certain of them circled in green. "I went over the trade secret list," stated plaintiff's counsel, "and omitted certain items". It was his suggestion that the defense waive or forego any cross-examination on the omitted items but nevertheless such, he stated, were to be included in any injunction the court might later issue with respect to trade secrets. This, for obvious reasons, was unacceptable to defense counsel and the trial as to trade secrets continued without substantial omission. Broken down into their various parts the defendants "four" trade secrets are actually 43 in number.

The defendants have categorized for purposes of trial and proof these variously enumerated trade secrets, whether they have been denominated "additional", "another", or what not, and has answered each in detail. We accept and adopt such categorization as a reasonable solution to the problem presented by plaintiff's cast of a wide net. Such categories relate to molds, hinges, links, and other classifications that will be discussed in due course.

Defendants urge, at the outset, that most of the first 40 of plaintiff's claimed 43 trade secrets (these 40 relating to the mold) were published in Jendrisak's earlier patent 3,094,403 owned by Libby-Owens-Ford, that he testified that he considered the entire mold as being Libby-Owens-Ford's trade secret, and, according to defendants, it is "manifestly absurd" for him to now claim that the same subject matter has become Shatterproof's trade secrets. In addition, that all forty of them were admitted by Jendrisak to have been shown in the patent-in-suit and also in each of his four foreign patents. Plaintiff's reply is that 3,094,403 did not issue until after Little and Kapron went to Guardian, and, moreover, that defendants are in error as to the dates of publications of the foreign patents. Defendants respond that "the pattern of seeking patents negates any intention to preserve the patent disclosures as trade secrets". We are not going to be led into these collateral bypaths, remotely relevant, and interesting though they may be, but will turn at once to content of the particular trade secrets involved within the categories described.

We start with the hinges, which are essential to the functioning of the mold. Items 1–3 and 8–12 relate thereto. We eliminate items 1 and 7 at once, since Mr. Jendrisak admitted that these were never trade secrets of the plaintiff. Items 2, and 8 to 11 relate to the dimensions of the hinge and the materials thereof. We find no clear and unambiguous specifications of what portions of these items, if, indeed, any, are claimed to be trade secrets. Item 3 concerns the coordination of hinge axes. It was conceded by counsel (Tr. 535) that this was not a trade secret. Item 12 (involving a hinge positioning and design) was previously used in the prior art Ford mold.

As to the construction of the mold, items 4–6 and 13–16 on plaintiff's list (defendants' exhibit B), the first group, involving the support of the glass on six points in a horizontal plane without the use of stops to contact the edge of the glass, employ concepts widely known in the glass industry (see, e. g. the prior art Ford mold) prior to 1956 and could not have been the trade secrets of the plaintiff. Items 13–16 concern the concept of counterbalancing the mold in order to minimize the pressures on the glass during the bending operation. Such devices were widely employed, the problem being merely one of varying pressures or weights to obtain minimum, or desirable, pressures. There is nothing of the legal (or practical) trade secret herein. The three remaining items (17, 19–22) were admitted by plaintiff to be neither used by nor asserted against the defendants. Item 18 relates to the use of swinging links to carry the end sections of the mold. It is shown in Jendrisak's 1951 patent 2,551,607 and elsewhere. It thus could not have been plaintiff's trade secret.

We next get into the area of heat shielding and absorbers. It will be recalled that the glass-carrying molds travel through a furnace, wherein the glass softens, and bends. It is desirable to control the furnace heat, either by preventing its reaching certain portions of the glass, or assisting in its radiation. Contraptions to accomplish such purposes are practically as old as the industry itself, being shown in old patents as well as new. Mr. Jendrisak admitted that he knew prior to filing the suit that heat shielding was an old and well known technique in the industry. (Tr. 1558) Mr. McKelvey also testified that he knew of the use of heat shielding and heat absorbers at Pittsburgh Plate Glass prior to 1955. The items we have considered (23–25) we find were never plaintiff's trade secrets.

We come now to the matter of the materials out of which a mold is constructed. In common with the desire of all engineers to use materials that are as economic and efficient as possible for their desired purposes, mold designers have used a variety of materials and techniques. Items 26–31, and 40, all relate to the materials and methods of fabricating the mold elements. The industry employs, for example, welded metal strips rather than the heavier castings, perforated plain carbon steel elements welded together rather than larger entire stainless steel sections. These devices were all well known and widely utilized design practices, and the record is completely lacking in any persuasive testimony that these were trade secrets of the plaintiff in 1956. Likewise the use of trusses to reinforce the mold (Items 32–35) was a widely known and used idea. We take judicial notice of the fact that they are widely used on bridges. Mold makers Kapron and Little both testified as to the common use of trusses in many designs requiring reinforcement, boxcars, and trucks, as well as bridges. The use of trusses is found also in prior patents, see Jendrisak's 2,551,-607. It is our finding that reinforcement by the use of trusses was not a trade secret of plaintiff in 1956.

It is alleged also that the holddown described in the patent before us was a trade secret. We have held heretofore, however,[11] that plaintiff's holddown has

---

11. See discussion of Claim 7.

not been used by the defendants and hence we need not pass upon its secrecy.

The plaintiff asserts also that its "cutting ring" template is a trade secret. The template is used for cutting the outline of the glass prior to its bending. There is nothing new in the use of a template as a cutting guide, and such a template can be made in many ways, such as machining the ring out of a metal plate. What plaintiff did was to cut a groove in a plastic sheet and pour into it a plastic (here a thermoplastic epoxy resin). The groove was a female replica of the ring to be formed. This is an old technique for casting parts (McKelvey), is used for many kinds of fixtures, and is simply one of the skills employed by any competent mold maker (Kapron). In addition, as to secrecy, patent was applied for in 1957, but the Patent Office Examiner considered "that the art of casting something out of a resinous plastic was old and it didn't see 'any need of' (sic, 'anything new in') casting this particular part out of a plastic". (Tr. 808) Finally, it appears that it was not until the year 1956, which was after Little and Kapron had left, that Mr. Jendrisak had a "usable" cutting ring. We find lacking in all of this any enforceable trade secret.

"Scheduling" is the last of plaintiff's alleged trade secrets. What scheduling refers to is really the order in which the glass is sent through the furnace. It may be desirable to send it through on some kind of schedule, arranging the glass in ascending (or descending) order of curvature and adjusting the furnace characteristics and travel thereto. Or, the molds may simply be sent through the furnace with only a random, or hodge-podge placing thereof. Mr. Jendrisak admitted that he had no knowledge of any use by the defendants of this trade secret, if, indeed, it was a trade secret, and we find no such use.

Underlying all of this discussion of trade secrets is another critical factor, namely, the individual expertise and background of the alleged wrongdoer. Was he, in truth, some newcomer who saw a new (to him) and fertile field, and proceeded to plough it with technicians purloined from plaintiff? Or was he an old hand in the business, employing for expansion thereof whatever help was available on the open market?

Defendants' Vice-President was Mr. Hertzberg. He is a man of 72 years of age, 57 of it in the glass business, 31 with Guardian. His previous experience was with Triplex Safety Glass (of New Jersey) and the Ford Motor Company, where he had been shift superintendent of their glass operation. Guardian's business had been that of manufacturing flat laminated safety glass for the auto industry before it had gotten into the bending which is involved in the present controversy. When Guardian decided to go into the manufacture of bent glass, Mr. Hertzberg "went out to Ford Motor, knowing the general manager of the glass division * * * and I advised him of our plans". He enjoyed a cooperative relationship with Ford, arising out of not only his prior employment there, but also because of the fact that Guardian was a good customer for Ford glass. During 1954–1955 many visits were made to the plant, with particular attention being paid to the bending operations, and the Ford bending mold heretofore discussed. Ford assisted Guardian in its planning, Mr. Hertzberg ordering the same kind of bending furnace as that used at Ford. He personally designed the layout of Guardian's bending operation. It was about this time that Harvey and Little were hired. There was considerable mobility among the workmen in the industry, in fact, Little and Kapron "and probably about five other people that were foremen or experienced—we'll call them mold makers —left our [Guardian's] employ to go over to Chrysler to start that up there" and we have noted Mr. Jendrisak's (and other's) departure from Libby-Owens-Ford and Pittsburgh Plate Glass, going to Shatterproof. We have concluded heretofore that there was nothing legally sinister in this hiring of Kapron and Little. After their hiring they, with Mr. Hertz-

berg, visited the Ford plant and observed the Ford molds in operation. In addition, Guardian purchased competitive windshields, for examination and study, from Libby-Owens-Ford and Pittsburgh Plate Glass, determining therefrom the hinge points. Trial runs were had in due course, Ford furnishing reject glass for this purpose, and the technicians of the furnace manufacturer (Surface Combustion) remained at the new operation for over a month to adjust the furnace.

From the extensive testimony taken, the essential parts of which are summarized above, we are persuaded (and we find) that Guardian acquired its industry expertise from legitimate sources and in no way exploited illegally the knowledge of Little and Kapron. There was here no appropriation of trade secrets through participation in the breach of alleged confidential relationships between plaintiff and these employees.

The defendants assert laches on the part of the plaintiff, and, as well, the running of the statute of limitations. The hiring of Little and Kapron took place in 1956, at which time, as we have described, Guardian was moving from flat lamination of glass into the bending business. Both Jendrisak and Chase knew of such hiring and knew that these employees were going to continue their trade with their new employer and that they would be taking their "trade secrets", if any, with them. There can be no question but that Mr. Jendrisak and Mr. Chase knew that Guardian's setting up of a bending operation would necessitate the expenditure of large sums of money. Mr. Jendrisak estimated as the cost of what was termed "the whole set-up for bending glass" to be "I'd say roughly a million, a million two hundred thousand, a millon three hundred, four hundred thousand, thereabouts". (Tr. 610) This does not include building or land. In addition, around a hundred thousand dollars a year would be required for molds alone. Never in the reported cases have we encountered a similar situation, where the success of a business venture involving the expenditure of over a million dollars for capital equipment alone is alleged to have rested upon the unlawfully used knowledge of two hourly-paid laborers (not executives, nor supervisors, nor even foremen) from another plant, neither having the slightest inkling, or receiving the slightest warning, that they were carrying with them "trade secrets", the faithless disclosure of which would, principally, spell success for this huge investment. With Jendrisak's and Chase's knowledge of the magnitude of expenditure required, if, as they now assert, it was to be remunerative principally through the theft of Shatterproof's trade secrets, via Little and Kapron, it was their duty to warn in unequivocal and unmistakable terms of the dereliction and its consequences. Yet not one word was said on that specific subject and reliance is now placed upon certain letters concerning patents which we will analyze in due course.

■ Although Shatterproof had knowledge in 1956 of the alleged theft, and of the expenditures necessarily made, suit was not filed until 9 years later. Obviously, the misappropriation of trade secrets is not a continuing offense. The wrong occurs at the time of the improper acquisition. Russell v. Wall Wire Products, 346 Mich. 581, 78 N.W. 2d 149 (1956). The same issue was discussed in the case of Monolith Portland Midwest v. Kaiser Aluminum, 407 F.2d 288 (CA 9, 1969). The first issue before that Court does not concern us here (involving knowledge of the use) since knowledge of the cause of action nine years prior to suit was clear and, we think it is fair to say, admitted on the record. The second point, however, whether each use of the alleged secret is a new wrong, and that a continuing use is a continuing wrong, is in point here, the Court holding with respect thereto, that

"The protected relationship, contractual or confidential, is one to which, as Mr. Justice Holmes observed, 'some rudimentary requirements of good

faith' are attached. 'Whether the Plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be. Therefore the starting point for the present matter is not property * * *, but that the defendant stood in confidential relations with the plaintiffs * * *.' E. I. DuPont de Nemours Powder Co. v. Masland (1917) 244 U.S. 100, 102, 37 S.Ct. 575, 61 L.Ed. 1016. The fabric of the relationship once rent is not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravated. The cause of action arises but once * * *." 407 F.2d at 293.

See, also, Restatement of Torts (1939) Section 757.

▌ We have held heretofore that no confidential relationship existed. We will add that, the alleged wrong having occurred in 1956, the Complaint is clearly barred by the statute of limitations.

▌ Moreover, the Complaint is barred by laches. The above-described findings of fact make this conclusion inevitable. Plaintiff seeks to avoid the result by pointing to four letters which it wrote to representatives of Guardian. These letters we have examined in detail and have construed them in the light of the testimony before us. The first, written by Shatterproof, some 2½ years after the hiring of Little and Kapron, advises that "we have allowed claims in pending U.S. patent applications which we have reason to believe cover glass bending molds used by Guardian Glass Company". The letter goes on to assert that Guardian "persuaded" Shatterproof's employees to leave it and work for Guardian, and continues that those employees were "instrumental" in installing Shatterproof bending technology and processes at Guardian and that Guardian "now use[s] equipment identi-

cal or similar to the equipment used at Shatterproof". The letter warns that "When these applications issue as patents, Shatterproof has every intention of enforcing them against infringers". The patent spoken of issued some five years later.

Guardian's patent counsel replied to this letter in effect by asking for greater details as to the "persuaded" employees, as to the bending technology allegedly coming to Guardian through these employees, the basis for predicating conclusions of infringement, and requesting Shatterproof to assist it in tying down "these rather general assertions of violations of patents and confidences to more specific details". In reply Shatterproof's patent counsel stated in part that

"Guardian Glass did not bend glass until after these men went to work for it. We can only assume that the Shatterproof bending techniques were used in whole or part by Guardian in order to achieve this result because none of these men had experience in bending glass prior to their employment with Shatterproof. In other words, the only bending techniques these men knew about were those used by Shatterproof."

It stated, as well, that "Shatterproof is not making a claim against Guardian now. It is simply advising the Trustee that it has very good reason to make a claim when and if its patents issue." This letter, in fact the entire correspondence, concerns patent claims. If trade secrets are to be read therein, it can only be by indirection, yet we are dealing with the letters of experienced counsel who well know how to charge trade secret theft. The reasoning employed by Shatterproof in the correspondence is neither clear nor impressive. It seems to be that Guardian is infringing Shatterproof's patent claims because it did not bend glass before Little and Kapron went to work for it and all they knew they got at Shatterproof, whose techniques are covered by pending patent claims. But this whole structure

collapses if Guardian were merely employing the customary crafts of the trade, using knowledge legitimately obtained at Ford and in the open market, which is our conclusion upon the record before us.

The reasons given for the delay in the assertion of notice of a trade secret claim are not impressive. First, that Guardian was in bankruptcy. Timely assertions of claims in bankruptcy are a commonplace. It is argued that the patent before us did not issue until 1963. The trade secret claim, however, which is distinct from the patent claim, fully matured in 1956. Finally, Shatterproof argues that it had no positive proof of trade secret violations until 1964, when it allegedly sent one of its employees into the Guardian plant on a "mission" to find out what they were doing. He is said to have submitted a written report to both Chase and Jendrisak, but Jendrisak's trial testimony makes no mention of it. He is said to have reported back "that they were using our methods," "our mold", "our hold-downs and our hinges". Even if made, the belated investigation could not reasonably be termed due diligence under these circumstances. We have found heretofore, however, that both Chase and Jendrisak knew in 1956 that Guardian was about to set up a glass bending operation and that both Little and Kapron were going to practice their trade at Guardian as they had at Shatterproof. Yet despite Jendrisak's admission that the only basis he had (Tr. 1442) for these widespread charges of the theft of trade secrets was the bare fact of the hiring of Kapron and Little, he did not even speak to them (or Guardian) about or against the disclosure of trade secrets. The plaintiff's President, Mr. Chase, repeatedly pressed for reasons for the nine year delay in filing suit, repeatedly answered in substance "No reason in particular".

We find that plaintiff was inexcusably and substantially dilatory in prosecuting its claim. The Complaint is barred by laches in addition to the running of the statute of limitations.

We are asked by defendants for an award of reasonable attorney fees under 35 U.S.C. § 285, "The Court in exceptional cases may award reasonable attorney fees to the prevailing party". The cases (e. g. Plymouth Rubber Co. v. Minnesota Mining, 203 F.Supp. 595, 601 (D.Mass.1962)) illuminate the statute, it being their holdings that there must have been vexatious or harassing litigation, really smelling of bad faith. We cannot find that here. The plaintiff's patent claims are manifestly without merit but this is not the first case where that situation has obtained, and we are not persuaded of bad faith with respect thereto.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter of the action.

2. Claims 1, 3 and 7 in suit are all invalid as obvious under 35 USC 103.

3. Claims 1 and 3, if valid, are infringed by Defendant.

4. Claim 7, if valid, is not infringed by Defendant.

5. Plaintiff possessed no bona fide trade secrets as of the time of the alleged theft by its former employees Little and Kapron and Defendant in 1956.

6. Plaintiff has no confidential relationship with either of its former employees Little and Kapron or with Defendant.

7. Defendant acquired all of its glass bending expertise (referred to in the record as its "know-how") by legitimate means, and was not guilty of any impropriety in this regard.

8. The Complaint is barred by both laches and the statute of limitations.

It is ordered and Counsel for Defendants will submit appropriate judgment in accordance herewith.