**METALLURGICAL INTERNATIONAL, INC., a corporation of New Jersey, Plaintiff,**

v.

**KAWECKI BERYLCO INDUSTRIES, INC., a corporation of Pennsylvania, Defendant.**

Civ. A. No. 70–550.

United States District Court,
E. D. Pennsylvania.

Sept. 14, 1972.

John N. Bain, Popper, Bain, Bobis & Gilfillan, John G. Gilfillan, III, Newark, N. J., Stanley H. Cohen, Caesar, Rivise, Bernstein & Cohen, Philadelphia, Pa., for plaintiff.

Stanton T. Lawrence, Jr., Pennie, Edmonds, Morton, Taylor & Adams, Merton S. Neill, Philip T. Shannon, New York City, Joseph W. Swain, Jr., Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

FULLAM, District Judge.

### I. *Background*

Plaintiff Metallurgical International, Inc. (MI), a New Jersey corporation, has brought this action for infringement of claim 3 of its patent No. 3,184,169 against defendant Kawecki Berylco Industries, Inc. (KBI), a New Jersey corporation. KBI asserts that it has not infringed the patent and counterclaims for a declaration of its invalidity of all the claims of the patent on various grounds.

The subject of the patent in suit is an "Apparatus for Pneumatically Pulverizing Material." In essence, the device reduces the size of powdered material by introducing the material to be pulverized into a high-speed airstream, which is directed against a target. The particles hit the target, break apart and are thus reduced in size. The particles are then conveyed away from the target chamber and are classified according to size; particles which have been sufficiently reduced in size are collected as product and larger particles are recycled until the proper size reduction is achieved.

The patent in suit, however, contains a number of embellishments upon this theory of operation which, of course, are critical in resolving the issues presented here and necessitate, therefore, a somewhat detailed explanation of the operation of the device.

#### a. *Operation of the Patented Device*

A feed hopper (19 [in the Appendix, Figure 1 of the patent]), a tank, with valves at the top and bottom, contains the material to be pulverized. The material falls through the valve (69) at the bottom of the tank through the vertical part of an inverted T and into an airstream passing through the horizontal part of the T. The airstream with the entrained particles passes through a ven-

turi-shaped nozzle mounted in a blast chamber (above 17 in Fig. 1; see detail in Figs. 2 and 3), which raises the velocity of the airstream, and then against a target.

Air flows out of the bottom of the blast chamber through an opening into a conduit (32). The conduit is connected to a primary classifier-recycler (22) which generates a partial vacuum in the conduit and blast chamber and the air and the particles passing from the nozzle are drawn toward the primary classifier recycler.

The classifier recycler separates the particles into fractions. Those particles of a sufficiently small size are pneumatically conveyed to two cyclone precipitators (23, 24), where product is collected. The larger sized particles, which need to be recycled through the pulverizing stage, exit through the bottom of the primary classifier to a "primary hopper" or "vacuum hopper" (20) just above the feed hopper. Valve 21 located below the primary hopper seals the primary hopper from the feed hopper until the feed hopper is empty. When this occurs valve 69 below the feed hopper detects a differential in air pressure which results when no material is being fired through the nozzle, and closes sealing the feed hopper from the blast chamber. At the same time the valve between the primary hopper and the feed hopper opens and allows material to fall into the feed hopper. The valve below the feed hopper and the T then opens and the valve between the primary hopper and the feed hopper closes and the cycle begins again. A time valve (67) controls the period of time the device will continue to operate. In order to obtain the desired product purity in some embodiments of the invention, the parts subject to wear in the interior of the device, particularly the nozzle, the target and the walls of the blast chamber, are lined with the material to be pulverized.

b. *Claims*

The seven claims in the patent may be divided into two different sets. One set is primarily directed toward the mechanics of automatically recycling the material to be pulverized until it has been reduced to the appropriate size. The other set is focused on the idea of lining the internal wear surfaces of the apparatus with the material being pulverized to produce a purer product.

Claim 3, the claim alleged to be infringed, is the broadest of the first set. It reads as follows:

"Apparatus for pneumatically pulverizing material comprising:

"(a) a closed vessel defining a blast chamber;

"(b) a blast nozzle extending into the blast chamber;

"(c) an impact shield in the blast chamber opposite the end of the nozzle;

"(d) a material cycling conduit connected to the bottom of the blast chamber;

"(e) vacuum generating classifier means connected to the material cycling conduit and located above the blast chamber, the classifier means having an oversized particle discharge port in its bottom and an undersized particle discharge port;

"(f) a vacuum hopper connected to the oversized particle discharge port, the vacuum hopper normally being under negative pressure generated by the classifier means;

"(g) a feed hopper connected to the vacuum hopper and located therebeneath;

"(h) first valve means between the vacuum hopper and the feed hopper;

"(i) a T conduit connected to the bottom of the feed hopper;

"(j) a source of high pressure air and the blast nozzle connected to the T conduit;

"(k) second valve means between the feed hopper and the T conduit;

"(l) means for operating the first and second valve means in timed relationship to each other;

"(m) means for introducing material to be pulverized into the nozzle."

Claims 4 through 6 are dependent on 3 and add refinements. Claim 4 adds to

the structure in claim 3 a "pressure differential detection means connected between the material recycling conduit and the blast nozzle, and operatively connected to and controlling the second valve means between the T conduit and the feed hopper, the second valve means opening when no material is passing through the nozzle."

Claim 5 adds to the structure in claim 3 a hopper and conduit as part of the blast chamber structure for introducing raw material into the system. Claim 6 adds to the structure in claim 3 the fabrication of the interior of the blast chamber, the surfaces of the nozzle and the impact shield of the material to be pulverized.

The other set of claims may be said to begin with the last claim, 7, which claims the blast chamber, nozzle and impact shield set forth in (a), (b) and (c) of claim 3 with the blast nozzle being "connected to a source of high pressure air," the target and the internal passage of the nozzle being fabricated of the material to be pulverized, plus "means" to introduce the material into the nozzle and "means" to classify and recycle or collect as product the material that passes out of the blast chamber.

Claim 1 is not dependent on claim 7 though it could be, for claim 1 merely repeats claim 7 except that the interior surface of the blast chamber and the exterior surface of the nozzle are also fabricated of the material to be pulverized. Claim 2 is dependent on claim 1 and adds (analogously to claim 5) a hopper and a conduit as part of the blast chamber structure for introducing raw material.

c. *Origin of the Invention*

The patented device had its origin in MI's attempts to find a way to make pure, finely powdered tungsten carbide from scrap sintered tungsten carbide. The product powder is useful in making sintered tungsten carbide tools and parts which can withstand high-wear conditions. Tungsten carbide is difficult to reduce to a fine powder because it is very hard and abrasive and rapidly wears away the working surfaces of many sorts of grinding equipment, thus limiting the life of the equipment and contaminating the ground product.

In 1961, MI's then executive vice-president, Jerome Shaw, visited the Stoody Company in Whittier, California, a prospective customer, and was shown as a part of the regular tour Stoody gave to all visitors a device which produced powdered tungsten carbide by entraining it in an airstream and projecting it against a target. Shaw apparently learned that Stoody had obtained the design and components of the machine from Vacu-Blast Corporation in California, for shortly after his visit Shaw, in a letter dated September 6, 1961, wrote to Vacu-Blast (D-1) and requested information about Stoody's device, referring Vacu-Blast to its drawing No. KB 2203 of the Stoody device. Vacu-Blast referred Shaw to its sales representative in the area, Airbrasives, Inc.

MI then began the construction of its own pneumatic pulverizing device with the assistance of representatives from Airbrasives. MI was successfully operating its device late in 1963 and was selling products of the device commercially in 1964.

d. *File History*

In June of 1962, while the development of the device was under way, Shaw consulted John N. Bain, a patent attorney, concerning the possibility of obtaining a patent for the device. On March 23, 1963, a patent application was filed.

Eight claims were in the original application. File History, D-135. Claim 1 was essentially the same as claim 1 in the patent except that surfaces of the blast chamber, nozzle and impact shield were to be fabricated of "a material substantially impervious to abrasion." In claim 2 these items were to be fabricated of tungsten carbide. In claim 3 the interior of the nozzle and the impact shield were to be fabricated of tungsten carbide while the exterior of the nozzle and the interior of the blast chamber were to be lined with rubber. In claim 4 the surfaces of these parts were to be fabricated of the material being pulverized.

Claim 5 was dependent on claim 1 and added to it a hopper and conduit as part of the structure of the blast chamber for the introduction of raw material and a conduit under the blast chamber for recycling material from the blast chamber. Claim 6 restated the elements of claim 5 and added lining the interior and exterior of the nozzle and the target with tungsten carbide.

Claims 7 through 9 were method claims. Claim 7 essentially recited the method of operation of the device in claim 1. Claim 9 was dependent on 7 and added the step of removing water vapor and oil from the air and maintaining a nozzle air pressure of 300 pounds per square inch. Claim 9 was dependent on 8 and added the introduction of raw material into the blast chamber while material was being pulverized and cycling the raw material through the classification system.

The examiner rejected claim 1 as anticipated by the Wiegand patent, which is discussed below, and rejected claims 2 and 3 because he found that it would be obvious to one skilled in the art to use a wear-resistant lining. Claim 4 which claimed linings of the material being pulverized was allowed subject to the incorporation of patent claim 1.

Claims 5 and 6 were rejected on the basis of Wiegand in view of the Kollbohm patent because Kollbohm showed introduction of raw material into the blast chamber in the same manner.

Claims 7, 8 and 9 were rejected as improper method claims since they essentially recited the operation of the claimed device.

Claims 7 and 8 were also rejected as obvious since purification of the air supply would be desirable if one were seeking a pure product and the choice of a particular air pressure was regarded as simply a matter of mechanical skill.

Claim 9 was rejected because it claimed the method of operation of the device found obvious in claims 5 and 6.

The examiner also noted that "venturi" nozzles and the type of impact shield used by the applicants were disclosed in the prior art.

In response to the examiner's action and after a telephone conference with the examiner, original claim 1 was modified to incorporate claim 4, and claim 5 which was dependent on the allowed claim was suggested to be allowable. Five additional claims, 10 through 14, were added which correspond to claims 3 through 7 in the patent.

The applicants suggested that claim 10 was distinguishable over the prior art because the recycling system including recycling by vacuum and periodically pressurizing and depressurizing the feed hopper.

In support of claim 11, the applicants alleged that the control device in which the closing of valve 69 under the feed hopper would open the valve between the vacuum hopper and the feed hopper refilling the latter with material to be pulverized.

Claim 12 (claim 5 in the patent) was suggested to be allowable because the Kollbohm did not disclose the same structure for introducing raw material into the blast chamber (and, in any event, claim 12 was dependent on 10). Claims 13 and 14 were suggested to be allowable because they incorporated the same subject matter found allowable in original claim 4, i. e., the use of linings of the material being pulverized.

Apparently applicant's arguments were accepted, for a notice of allowance was mailed on December 29, 1964.

The foregoing file history makes it clear that the applicant asserted and the examiner found two patentable distinctions over the prior art: (1) the use of wear linings of the material to be pulverized, and (2) the material recycling system.

e. *License to KBI, the KBI devices*

In 1965, KBI's predecessor investigated the possibility of using MI's device to pulverize beryllium. At the time KBI used disc mills which ground beryllium between two beryllium discs. This method was slow and subjected the beryl-

lium to high temperatures which caused it to oxidize and reduced its purity.

After some preliminary testing and negotiation, MI and KBI's predecessor entered into a license agreement on April 28, 1967. In the agreement MI granted the right to construct and use one device as described in its patent and agreed to furnish its know-how in building the device, for a payment of $10,000 per year commencing after the device had achieved a specified level of production. The first such payment was to be treated also as payment for MI's know-how.

With MI's assistance, KBI constructed a device and in January 1968, KBI determined that the production rates called for had been achieved. In February of that year it made its first $10,000 payment to MI. There is no doubt that use of the device has eliminated many of the problems which had plagued KBI in its manufacture of beryllium powder and KBI has since constructed two more of the allegedly infringing devices.

All of the devices operated by MI or KBI and alleged to be within the scope of the patent deviate from its precise teachings. The patent teaches a valve (69 in Fig. 1) between the feed hopper and the T. However, the devices actually do not have a valve but rather an orifice plate. The orifice plate has no pressure controlling function but rather meters the flow of material into the T.

As presently operated, then, the feed hopper is never sealed from the T, nor is the operation fully automatic. Instead, when the feed hopper is empty the device's operator turns off the high pressure air to the T and to the feed hopper. High pressure air is also furnished to valve 21 and when the air is turned off it opens allowing a new charge of material to fill the feed hopper. The operator then turns on the air which closes valve 21 sealing the primary hopper and starts the pulverization process again.

In addition, although the patent teaches that the primary classifier recycler is "vacuum generating" the vacuum in all devices is generated by a blower downstream of the classifiers. In the case of the KBI devices the blower is located downstream of the baghouse (the final filtering stage before the air used in the process is released to the atmosphere).

## II. Adequacy of Disclosure under § 112

### a. Alleged Typographical Errors

■ Before inquiring further into the validity of the patent, it is necessary to determine what the patent actually says to the reader; whether the specification is adequate under 35 U.S.C. § 112 to enable a "person skilled in the art . . . to make and use the same. . . ." Plaintiff asserts that the specification contains four alleged typographical errors, i. e., that the number "69" in column 4, lines 27, 31, 52 and 56, should read "67" and that these typographical errors would be obvious to one skilled in the art. This suggested correction is significant because it makes the specification more nearly describe the operation of the allegedly infringing devices.

However, plaintiff's suggestion of typographical errors must be rejected. Read as a whole, it is apparent that the specification was intended to read exactly as it reads now. This conclusion is suggested by the context of language in column 4 of the specification and compelled by claim 3 which claims the operation of the valve between the feed hopper and the T and the valve between the primary hopper and the feed hopper "in timed relationship to each other," and Figure 1 of the drawings which shows a valve between the feed hopper and the T which is connected to a symbolic "operator" on conduit 32.

Moreover, the file history of the patent reveals that MI, in its response to the first Patent Office action in the patent, pointed out in support of its argument for the patentability of their claim 11 that the valve between the feed hopper and the T, i. e., valve 69, closed when no material was passing through the T and caused the valve (21) between the primary hopper and feed hopper to open. There can be no doubt, therefore, that at that time MI did not think that the

references to valve 69 were typographical errors. Accordingly, this suggestion will be rejected.

### b. *Compliance with § 112*

The foregoing conclusion makes it unnecessary to consider defendant's contention that the uncorrected typographical errors would render the patent invalid under 35 U.S.C. § 112. However, it is necessary to determine whether the specification, as it now stands, complies with § 112. As the specification now reads, there is no statement about what causes valve 69 to reopen (or "recycle") after it closes to allow material to be introduced into the feed hopper through valve 21. However, this is a minor omission; one skilled in the art would easily provide a method to cause valve 69 to reopen. (It may be noted that though MI's suggested correction would eliminate this omission in the specification, the correction would raise problems more serious than those it would solve. Among other things it would be necessary to explain how the "electrically-operated timer valve" senses pressure.)

Finally, KBI suggests that because plaintiffs no longer practice their invention precisely in accordance with the specification, the specification fails to fulfill the requirement of § 112 that the inventor disclose the "best mode contemplated by the inventor of carrying out the invention." However, when the application was filed the invention was practiced substantially as described in the specification. It was only after MI had experienced repeated failures of valve 69 caused by the wear of the abrasive material on the valve that it discovered the valve could be eliminated. There is no evidence in this case that the applicants when they made their application failed to disclose the best method, known to them at the time, of practicing their invention. *See* Columbia Broadcasting System v. Sylvania Electric Products, Inc., 415 F.2d 719, 724 (1st Cir. 1969), cert. denied, 396 U.S. 1061, 90 S.Ct. 755, 24 L.Ed.2d 755 (1970).

For the foregoing reasons, I conclude that the patent in suit fulfills the requirements of 35 U.S.C. § 112.

### III. *Ownership and Alleged Intentional Nonjoinder of an Inventor*

Two other issues should also be disposed of at this point. The first is KBI's assertion that MI has not proved that it owned the patent at the time this suit was filed and may not, therefore, sue for its infringement.

At trial MI offered an assignment executed in March 1972, and proved that the assignment to MI had been executed in March 1963, but had since been lost. In view of this finding, KBI's concern that it might be subject to suits by the assignors for infringement up to the time of the execution of the March 1972 assignment is not well founded. It is clear that all the inventors had notice of this proceeding and are bound by this finding.

KBI has also maintained that Jerome S. Shaw, executive vice-president of MI until February 8, 1963, was an inventor of the invention embodied in the patent and that he was intentionally not named as an inventor in the application. The determination of Shaw's role in developing the patented device primarily involves questions of credibility and interpretation. He and Lawrence Friedman, who remains president of MI, were the founders of MI, a relatively small company. Shaw was certainly aware of the problems facing MI which furnished the impetus for its development of the device and it is apparent that he was alert for solutions to those problems.

However, Shaw's testimony in this record and assertions to others that he was the inventor of the device must be discounted. Shaw had a general inclination to emphasize the significance of his own role in describing past events and Shaw and MI, in the person of Lawrence Friedman, are not on good terms, inclining Shaw to testify unfavorably to MI's interest.

Shaw probably first brought the basic idea of pneumatic attritioning to MI and he played a supervisory and managerial role in the development of the device. However, Shaw did not play a significant

role in the actual design or construction of the device and thus I conclude that he was not an inventor of the invention embodied in MI's patent.

The three truly significant issues in this case remain to be considered. They are: (1) whether the patent is invalid because it was anticipated by the impact attritioning device at the Stoody Company plant in California; (2) whether the patent is invalid for obviousness; and (3) whether the devices operated by KBI infringe the patent.

## IV. *Anticipation by the Stoody Device*

The Stoody device was developed in 1955 in order to supply powdered tungsten carbide to Stoody's Pressure Casting Department. At that time Stoody's pressure casting operation was still in a developmental stage. However, it is clear that the device was used to produce products which were sold commercially at least by 1957.

William Schumert, Stoody's general manager, disclosed to William Mead of Vacu-Blast Corporation his idea to adapt a Vacu-Blast apparatus (normally used in sand blasting and similar operations), which automatically picks up by vacuum the abrasive material after it has been blasted and recycles it, to pneumatically pulverize tungsten carbide. Vacu-Blast prepared a schematic drawing (D–26, 24 Vacu-Blast's drawing No. KB 2203) and a description of the operation of the device (D–31), which embodied Schumert's idea. Vacu-Blast gathered the components of the device and shipped them to Stoody. Stoody, after some initial experimentation with the components, produced a device which fulfilled its requirements and the device was regularly used in the pressure casting department until that department's operations were terminated in 1961. The machine was then moved to another department where it continues to be used. Initially, the use of the machine and all operations in the pressure casting department were secret. However, well before MI's executive vice-president Shaw saw the machine sometime before September 1961, this secrecy policy had been abandoned and it was Stoody's policy to give most visitors to its plant a tour which included their being shown Stoody's impact pulverizing device.

KBI contends that Stoody's device anticipates the MI patent and constitutes prior art to be considered in determining the obviousness of MI's invention under § 103. MI concedes that the originally contemplated operation of the device as described in the Vacu-Blast drawing and description of the device "was substantially identical to the operation of the apparatus in suit." (*I. e.*, the actual devices involved here not necessarily the device described in the patent.) However, MI contends that the Stoody apparatus did not anticipate its invention because it was never operated in the originally contemplated manner and because the device was neither sold nor known or used by others within the meaning of 35 U.S.C. § 102(a)(b). In addition, MI contends that knowledge of the Stoody apparatus was not publicly available and therefore it is not prior art for the purposes of the § 103 non-obviousness determination.

The Stoody device was not "on sale" by Vacu-Blast within the meaning of § 102 (b). Vacu-Blast and Stoody jointly developed the device. Vacu-Blast performed the initial design and collection and construction of the components and sold the components to Stoody. Stoody assembled the components and experimented with them for a time until satisfactory results were obtained.

Nor has KBI sustained its burden of proof that Stoody's application for a Construction and Operation Permit from the Los Angeles Air Pollution Control District was accessible to the public so that it would constitute a publication within the meaning of § 102. Garrett Corporation v. United States, 422 F.2d 874, 190 Ct.Cl. 858, cert. denied, 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970); *see* Philips Electronic & Pharmaceutical Industries Corp. v. Thermal and Electronics Industries, Inc., 450 F.2d 1164, 1169–1171 (3 Cir. 1971).

■ However, it is clear that the Stoody apparatus was openly and regular-

ly used in the normal course of Stoody's business at least by the time Shaw saw it during or before September 1961, and probably well prior to that date. This constitutes a public use under § 102. Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 20, 59 S.Ct. 675, 83 L.Ed. 1071 (1939); e. g., Cali v. Eastern Airlines, Inc., 442 F.2d 65, 68 (2d Cir. 1971).

■ Plaintiff suggests that even if the Stoody device is prior art for the purposes of § 102, it should not be considered prior art for § 103 purposes because information about the Stoody apparatus was not accessible to the public. It suffices to say the cases do not recognize this distinction. E. g., Shatterproof Glass Corp. v. Guardian Glass Co., 322 F.Supp. 854, 861–862 (E.D.Mich.1970); Magnetics, Inc. v. Arnold Engineering Co., 438 F.2d 72, 73–74 (7th Cir. 1971). Therefore, the Stoody device will be considered as prior art for the purposes of making the non-obviousness determination under § 103.

The actual operation of the Stoody device is quite similar to the operation of the plaintiff's and defendant's devices. The Stoody device differs only in the following respects: (1) It uses a "Syntron feeder" (an electrically vibrated trough) to meter the material into the T, rather than an orifice plate; (2) Most of the pulverized material, including most of the product, is trapped by the reclaimer and drops into the primary hopper. The cyclone and baghouse serve primarily to collect dust. Product is collected by turning off the air and opening the union between the T and the feed hopper and draining the product from the feed hopper as it falls from the primary hopper; (3) The system beyond the nozzle is operated at a pressure slightly greater than atmospheric pressure because the air pump or "eductor" (an aspirating device) at the end of the system does not have an exhaust capacity at atmospheric pressure greated than the air input through the T.

In deciding whether the Stoody device anticipates patent in suit, the question

to be resolved is whether the Stoody device is substantially identical to the claimed invention. Contrary to plaintiff's contentions, the Stoody device can produce a result identical to that produced by the claimed invention, i. e., it could successfully grind to the same fineness the same materials ground in the devices used by plaintiff and defendant, albeit on a smaller scale.

However, the Stoody device does not produce this result in a way substantially identical to the patent in suit. As set forth below, in the section on infringement, the operation of the valves above and below the feed hopper in timed relationship to each other to depressurize and repressurize the feed hopper is one of the key elements of the invention embodied in plaintiff's patent. The Stoody device lacks the valve between the feed hopper and the T and thus the Stoody device can neither anticipate nor infringe the patent in suit.

Whether the other differences, the operation of the classification system at (slightly) positive pressure and the collection of the product from the union between the T and the feed hopper, would in themselves be sufficient to render the Stoody device non-identical in substance with the patent in suit need not be decided. Certainly, [1] these differences when coupled with the lack of a valve below the feed hopper lend some additional support to the conclusion that there is a lack of identity between the Stoody device and the patent in suit.

■ Accordingly, I find that the patent in suit is not invalid for lack of novelty under 35 U.S.C. § 102.

V. Non-obviousness under § 103

a. Scope and Content of the Prior Art

The references cited by the examiner are discussed first. The most significant of these is a 1946 patent to Wiegand, No. 2,392,019. Wiegand discloses an apparatus and method for reducing hard, abrasive materials to—200 mesh powders by pneumatic impact pulverization. Wiegand discloses an arrangement with two hoppers, one positioned above the

other, and valves at the top of the upper hopper between the two hoppers and at the bottom of the lower hopper. The valves are operated in sequence to enable material to be accumulated in the lower hopper under pressure without introducing the high pressure air at pressures of 1,000 pounds per square inch or more, into the system conveying the material to the upper hopper. The material in the lower hopper is then forced through a conduit through an air gun at which additional high pressure air may be introduced. The material is then carried through the gun and is propelled against a target where the pulverizing takes place. Material is then conveyed by air or gravity to a cyclone which separates the ground material into fractions. The smaller, lighter particles are conveyed to other cyclones for collection. The larger, heavier particles are conveyed by gravity to a classification screen; some is collected as product and some is conveyed by a conveyor by gravity to be recycled to hoppers and thence to the air gun. Wiegand contains a detailed description of the necessary hardware, alternative embodiments of the invention, the construction of the air gun and target. Wiegand suggests lining the parts of the apparatus subject to wear with tungsten carbide.

Plaintiff has suggested that Wiegand's effect as a reference is vitiated because the material in some parts of the system could not be conveyed to other parts in the manner Wiegand suggests. For example, it is suggested that air pressure would not cause a material flow between the raw material reservoirs and the first hopper. One skilled in the art could easily remedy such problems by, for example, putting the reservoirs above the first hopper and conveying by gravity.

Kollbohm, No. 1,847,009, issued in 1932, discloses a pneumatic impact attritioning mill in which the blast chamber or impact area is maintained at sub-atmospheric pressure and in which product is removed from the blast chamber by suction.

Chichester, No. 253,344, issued in 1882, teaches the use of a convex target which is centrally supported for increased rigidity by a support in the same planes as the stream of air and particles directed against it. It is to be noted in connection with the consideration of this patent that the operation of systems (including pneumatic impact pulverizing systems) which contain toxic materials at less than atmospheric pressure, was a well known expedient in the prior art well prior to the invention of MI's device to insure that all leakage would result in air entering the system, rather than in material leaving it.

Some of the other prior art was not before the examiner. Walton, No. 1,875,-531, issued in 1932, teaches the production of fine "flours" of abrasive materials such as silicon carbide by introducing the material into an airstream and projecting it against a target of the material being pulverized. The material is then carried by the moving air through a series of chambers with baffles or cyclones which separate the heavier and lighter fractions of pulverized material. The fraction of material which is larger than product size is collected and introduced again into the airstream by some undisclosed means.

Related to the teaching of the Walton patent is the testimony of defendant's expert, Hugh Boyd, which is accepted here, that the use of wear linings of the material being pulverized in impact attritioning devices was well known in the art in the 1950's and prior to that period.

Defendant also suggests that several patents to Mead, who is chairman of Vacu-Blast Corporation, should be considered as prior art. The most significant of these, Re 23,186, issued in 1950, discloses a type of sand blasting machine which entrains powdered abrasives in an airstream which is directed against the surface to be treated by a treating head. After the material hits the surface it is sucked into passages around the circumference of the treating head. The material is then pneumatically conveyed to a classifier where dust and debris are separated from reusable abrasive. The reusable abrasive then falls into a tank which is closed at the bottom by an air-

operated valve. Beneath that tank is another tank from which material is fed into the high pressure airstream through a T and thence to the treating head. When the air to the treating head is turned off the valve between the upper tank and lower tank opens and material falls into the lower tank. When the air is turned on again, the valve to the upper tank closes and the blasting operation is resumed.

There are two other Mead patents, No. 2,635,745, which relates to the continuous classification system using a cyclone and a screen and the valve system just described; and No. 2,521,931, which relates to the valve system beneath the lower tank which keeps the conduit to the treating head clear of abrasive material before and after blasting.

MI contends the Mead patents should not be considered as prior art because they relate to sandblasting, not to attritioning and grinding art. However, the mechanical arts are not so well compartmentalized. It is apparent that one skilled in the art of the design of pneumatic pulverizing devices who sought to design a device such as that embodied in the MI patent would look for guidance to the particular mechanical arts related to each aspect of the device. Such a person would have a broad range of mechanical engineering skills. For guidance in nozzle and target design he would look at other pneumatic attritioning devices and patents. For guidance in pneumatic conveying and classification he would look to that art. And, if his questions related to conveying and classifying abrasive materials, such a person would look to those arts involving the pneumatic handling of abrasive materials, including the Mead patents. Moreover, it should be pointed out that while the Mead patents are in themselves prior art references, the inventions described in them have been embodied in the Vacu-Blast devices which were in commercial use in the 1950's. Therefore, it must be concluded that the Mead patents are a part of the prior art for the purposes of making the § 103 determination.

Another prior art pneumatic pulverizing device cited by defendant is the Majac jet pulverizer (e. g., D–108), which has been used and sold since 1958. This device accomplishes impact attritioning by directing two particle-laden airstreams against each other. The pulverized material is then air-conveyed to a classifier which separates the product-sized particles from those which are to be returned to the airstream for repulverization. The Majac classification system could be operated under negative pressure to prevent leakage of material from the system. And, indeed, this operating system containing toxic materials at negative pressure is a common expedient where it is important to insure that the only leakage is into the system. Majac also has lined the wear areas of the device with the material being pulverized to minimize contamination.

KBI has also cited as prior art patent Nos. 2,765,122 and 2,487,088, to Trost and Andrews respectively. Trost discloses the use of venturi blast nozzles in a pneumatice attritioning device. Andrews teaches nothing of significance not described above.

b. *Differences Between the Prior Art, Level of Skill in the Art. Resolution of the Non-Obviousness Issue*

■ As explained previously, the claims in the patent in suit may be classified into two groups: claims 1, 2 and 7, which focus on the lining of wear parts with the material being pulverized, and claims 3 through 6, which focus on the cycling of material through the system. Putting the Mead patents and the Stoody device to one side for the moment, it is clear that the other prior art discloses all of the elements of the invention contained in both sets of claims. The patent's claims thus should be scrutinized "with a care proportional to the difficulty and improbability of finding invention in an assembly of old elements." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152–153, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950).

Turning first to claims 1, 2 and 7, it is evident from the file history that the examiner perceived the invention inhering in the use of wear parts made of the material to be pulverized. It is clear that this idea is an old one and well known in this art and that this aspect of the prior art was not before the examiner. Indeed, the Walton patent discloses everything in claim 1 except connecting the classification system to the bottom of the blast chamber, and lining wear parts other than the impact shield with the material to be pulverized. Certainly, the latter is an obvious variation. Collecting all the pulverized material from the bottom of the blast chamber and classifying it into product and recyclable material is an equally obvious variation of Walton. Means for the pneumatic conveying and classification of material were well known prior to the invention of MI's device and used in many different applications. It would be obvious to use such means to minimize material handling, if for no other reason.

The reduction of the raw material into the blast chamber which is the essence of claim 2 would be equally obvious where a recycling system is provided. The raw material must be introduced somewhere and the easiest place to introduce it is at a part of the system which operates at ambient or less than ambient pressure such as the blast chamber. To provide some means to separate a walled-off area or conduit in the blast chamber for the raw material opening would be an obvious mechanical expedient to prevent blasted material from being thrown from the chamber.

Claim 7, as explained previously, is a variant of claim 1 (or vice-versa) and is not meaningfully distinguishable from claim 1.

Thus, for the foregoing reasons, I conclude claims 1, 2 and 7 are obvious under § 103.

Claims 3 through 6 are directed toward the recirculating features of the device. The file history reveals that the applicants viewed the invention claimed in claim 3 as residing in recycling by vacuum and in the periodic introduction of new material into the feed hopper as it is periodically depressurized by the synchronized opening and closing of valves above and below it.

Again, without considering the Mead patents or the Stoody device, all the elements in the claim are old. While due regard must be given to the presumption of validity which arises under 35 U.S.C. § 282, even considering only the prior art before the examiner, it must be concluded that claims 3 through 6 are invalid for obviousness. The analysis may be begun by noting that pneumatic impact pulverization is old. Pneumatic pulverization will always produce a distribution of particle sizes: some correctly sized, some in need of further pulverization, and some too small. Naturally, in order to utilize this output, it is necessary to separate or classify three sizes. In order to integrate the pneumatic attritioning process with the classification stage, it is logical to classify with air and such conveying and classification systems are very well known in the prior art. The essence of the plaintiff's claimed invention resides in the coupling of the part of the classification system which collects the oversized material to be recycled and which operates at low pressure, with that part of the system which introduces the material to be pulverized into the airstream and which operates at high pressure. Wiegand discloses the way that is normally used in the prior art to take material from a low pressure system to a high pressure system without disrupting either system by permitting a direct connection between them. That is the use of "lock hoppers," which was discussed in the testimony of Hugh Boyd, defendant's expert.

In Wiegand, the lower hopper is continuously pressurized. The upper hopper is depressurized when it is receiving raw material. The valve on its top then closes and the valve between it and the lower hopper opens, pressurizing the the upper hopper and allowing raw material to flow into the lower hopper. In the patent in suit, the process is reversed. The upper hopper is continuously under

subatmospheric pressure and from time to time the lower hopper is sealed from high pressure air, the valve between the two is open, depressurizing the lower hopper and allowing material to flow into it.

This latter approach has an advantage in that it provides a hopper constantly available to receive material for recycle. However, on the other hand, Wiegand has a hopper which is constantly available to feed product into the blast chamber.

In any event, it is impossible to conceive how any invention can inhere in using this "lock hopper" arrangement to connect the classification part of the system with the attritioning part.

Claim 4, which recites the use of a pressure differential detection means to close the valve under the feed hopper when it is empty and open the valve between the two hoppers to fill the feed hopper, is one further obvious variation on claim 3. The desirability of automatically filling the feed hopper when it is empty is plain. The inventors claim one of several possible means of detecting an empty feed hopper and closing one valve and opening the other in response.

It is noteworthy that it is not disclosed precisely what causes the valves to open and close when the feed hopper has filled, but as mentioned above, in the discussion of the adequacy of the disclosure, this would not present a problem to one skilled in the art.

When either the Stoody apparatus or the Mead patents, Re 23,186 and 2,635,-745, are considered as prior art, the obviousness of these claims become apparent. These references essentially disclose the recycling systems in the patent except that neither uses a valve between the feed hopper and the T. When the feed hopper is to be filled, instead of closing that valve these references suggest eliminating the valve and simply turning off the high pressure air supply. The patent claims simply are an obvious variation of that approach and a variation which, as it has turned out, has been discarded by both MI and KBI in favor

of teachings of the Mead patents and the Stoody device.

Finally, a word should be said about the commercial success of the devices which are said to infringe this patent. MI's devices have proved quite useful in pulverizing tungsten carbide and particularly in pulverizing beryllium. The device does not oxidize the beryllium and it produces an otherwise pure product. In addition, the device can be operated in such a way as to minimize the escape of beryllium into the surrounding area. This high utility does not render this invention patentable. MI clearly did not obtain a patent on a particularly good method to pulverize beryllium. *See, e. g.,* Deere & Co. v. Speery Rand Corp., 322 F.Supp. 397, 399–400 (E.D.Calif.1970). The same potential advantages described are inherent in most of the prior art pneumatic pulverization devices and their obvious variations.

Though secondary considerations such as commercial success are not particularly relevant where obviousness is as plain as it is here, the commercial success of this device can be reconciled with its obviousness without difficulty. The development of MI's device was a response to the growth of the technology of powder metallurgy and the increased demand for certain types of powdered metals. It appears that MI and others cast about for a way to produce these powders and MI was the first to recognize and successfully utilize known pneumatic pulverizing techniques. MI exercised skill and developed know-how and was the first to build a device which fulfilled a developing need. However, it was really a case of MI simply being first to use known technology to solve a new problem.

Accordingly, I have concluded that claims 3 and 4 of the patent are invalid for obviousness under 35 U.S.C. § 103, and that claims 5 and 6 are similarly invalid for the reasons set forth in the discussion of the the invalidity of claims 1, 2 and 7.

## VI. *Infringement of Claim 3*

Plaintiff first suggests that defendant is estopped to deny infringement.

However, the rationale of Lear v. Adkins, 395 U.S. 693, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), clearly permits a licensee to challenge both the validity and scope of the licensed patent.

The KBI device had been discussed previously.

It differs in operation from the device described in the patent primarily in that: (1) it lacks a valve between the feed hopper and the T; (2) the vacuum in the classifier section is not generated by the classifier recycler as called for by paragraph (e) of claim 3 but by a blower downstream of the baghouse; and (3) the blast nozzle does not extend "into" the blast chamber as called for by paragraph (b) of claim 3.

Turning to the latter item first, both parties agree that functionally, it is of no significance whether the nozzle extends into the blast chamber or is flush with its wall. One skilled in the art would recognize this. Therefore, I conclude that this language of the claim should be given a broad interpretation and that in paragraph (b) of claim 3 the words "extending into" may be interpreted as meaning "opening into."

The same general analysis would apply to the second item of difference. While the specification is of no aid in resolving this ambiguity (see col. 4, line 14), one skilled in the art would readily recognize that the classifier could itself generate a vacuum or that an air pump of some sort downstream of the "undersized particle discharge port" could generate the vacuum and that the two arrangements would be substantially equivalent. I conclude that it would be reasonable to resolve any doubt in favor of the patent and find that claim 3 covers devices in which the vacuum in the classifier is generated externally.

The first item, however, the lack of a valve between the feed hopper and the T, is more significant. KBI points out that because the device lacks a valve as called for by paragraph (k) of claim 3, its device cannot be said to incorporate the element of paragraph (1) which involves operating the valve called for in paragraph (k) in timed relationship with the valve between the vacuum hopper and the feed hopper. Plaintiff contends, however, that the orifice plate between the feed hopper and the T in defendant's devices is a valve and is equivalent to the valve called for in paragraph (k).

■ It is abundantly clear that whatever invention is embodied in this patent inheres in the use of valves with a pressure sealing function above and below the feed hopper. The valve between the feed hopper and the T is a pressure sealing valve which enables the feed hopper to be periodically depressurized. This function of the valve was pointed out by the applicants in the file history of the patent. An orifice with a metering function is not equivalent. Indeed, a metering function in either the open valve between the feed hopper and the T or in the conduit leading to the T is already inherent in claim 3 of the patent. The specification and drawings teach that there are three valves, one above and one below the feed hopper and the "electrically operated timer valve." In the allegedly infringing devices the use of the valves which, so far as claim 3 of this patent is concerned, has a crucial function has been entirely eliminated. I therefore conclude that claim 3 of the patent has not been infringed by defendant.

## VII. *Attorneys' Fees*

Both parties claim attorney's fees. Essentially, defendant suggests that plaintiff could not have had a good faith belief in the validity of its patent, while plaintiff suggests that defendant wilfully infringed and generated this litigation because it believed plaintiff could not sustain the burden of a suit for infringement.

■ I find that although plaintiff could not have had great hope for the validity of its patent, its position was not frivolous either legally or factually. Obviously, a similar conclusion applies to defendant's position. Therefore, I conclude neither party is entitled to an award of attorney's fees.

VIII. *Relief*

For the reasons set forth above, an order will be entered declaring claims 1 through 7 of the patent in suit invalid and declaring claim 3 not infringed by defendant.

APPENDIX