Gregory Frank **SCHIMIZZI** and Ernest Joseph Schimizzi, Plaintiffs,

v.

**CHRYSLER CORPORATION**, Defendant.

No. 77 Civ. 1169 (WCC).

United States District Court,
S. D. New York.

Nov. 6, 1978.

McAulay, Fields, Fisher & Goldstein, New York City, for plaintiffs; Lloyd McAulay, New York City, of counsel.

Morgan, Finnegan, Pine, Foley & Lee, New York City, for defendant; John C. Vassil, New York City, of counsel.

Harness, Dickey & Pierce, Birmingham, Mich., for defendant; Don K. Harness, William L. Anthony, Jr., Birmingham, Mich., of counsel.

## OPINION AND ORDER

CONNER, District Judge.

This is an action for infringement of U.S. patent No. 3,740,980 which was issued to and is owned by plaintiffs Gregory and Ernest Schimizzi, two brothers of Brooklyn, New York, for an invention entitled "Automobile Trunk Lock Mechanism (Anti-Theft Device)." Plaintiffs charge infringement of the patent by the anti-theft trunk lock mechanism which has been used by defendant Chrysler Corporation since the model year 1975 on the Dodge Charger and several other types of their automobiles.

This opinion incorporates the Court's findings of fact and conclusions of law, pursuant to Rule 52(a) F.R.Civ.P., following a non-jury trial.

## FACTUAL BACKGROUND

During the late 1960's, there was an outbreak of a new and ingenious type of larceny directed at the trunk compartments of automobiles. Then, as today, automobile trunk lids were conventionally secured by a key-operated cylinder lock mounted through the outer panel of the lid, with a latch mechanism mounted on an inner panel spaced several inches from the outer panel and actuated by a flat stem extending from the lock cylinder into a slot in the latch. Would-be thieves discovered that by punching a small hole through the outer panel of the trunk lid adjacent the lock, for example, by stabbing the relatively thin metal panel with a large screwdriver, they could insert the screwdriver through the hole and, using the lock stem and the outer face of the

latch as guides, could locate the slot in the latch, insert the tip of the screwdriver and turn it to release the latch, freeing the lid.

This problem soon became widely recognized and the subject of general discussion in the industry. In 1968, both the National Automobile Theft Bureau and the New York City Police Department issued notices concerning the problem which were received by Chrysler, and Chrysler began investigating expedients to foil the technique. Among the devices with which Chrysler experimented during the early period was a flexible tubular section, cut from a garden hose, which was force fitted over the inner end of the lock body and extended over the lock stem to the outer face of the latch, thereby blocking external access to the slot in the latch.

In the summer of 1969, plaintiffs, then students, became aware of the problem. In an effort to devise a solution, they studied the construction of the trunk lock on their own 1968 Pontiac, and visited a city dump to examine the trunk locks on other makes and models of automobiles. They learned that most, if not all, employed the design previously described, with the latch mounted on a spaced inner panel and actuated by a lock stem received in a slot in the latch. They soon conceived a solution similar to that previously considered by Chrysler: a tubular metal sleeve surrounding the lock stem with its outer end abutting the lock body and its inner end abutting the outer face of the latch to block external access to the slot in the latch.

In the fall of 1969, plaintiffs approached several United States automobile manufacturers in an effort to interest them in incorporating this device in their cars, but were told, in effect, that the companies would pay for the use only of ideas which were patented. Since plaintiffs were still in school, the cost of a patent application was an initial deterrent. but on June 2, 1971 plaintiffs themselves, without the aid of an attorney, finally prepared and filed an application for patent. As might be expected, the application was initially rejected by the Patent Office as informal in several respects, including the fact that the single "claim" consisted merely of several sentences listing asserted advantages of the invention, without describing the structure by which they were achieved.[1] This clearly functional claim was rejected under 35 U.S.C. § 112 "for failing to particularly point and distinctly claim" the invention, and under 35 U.S.C. § 102 for anticipation by the prior U.S. patent No. 2,218,683 to Miller.

In September 1972, plaintiffs went to Washington, D. C. for a personal interview with the Patent Office Examiner in charge of their application and, in addition to obtaining an explanation of the deficiencies of their application, apparently convinced the Examiner of the novelty and patentability of the invention. Shortly thereafter, on October 4, 1972, plaintiffs filed an amendment to their application, cancelling the original claim and substituting a new Claim 2 which was somewhat more suggestive, but still far from adequately descriptive of the structure employed.[2]

After considering this amendment and apparently finding it inadequate, the Examiner spoke by telephone with Ernest Schimizzi on January 12, 1973 and received his approval to amend the application again, cancelling Claim 2 and substituting a new

1. The original "claim" read as follows:

A Device which will afford protection to points or parts of the existing trunk lock by the establishment of a barrier manufactured from durable materials and fashioned to conform to various automobile trunk lock designs; the result will prevent the entry, without the use of a key, of the closed automobile trunk lock mechanism and surrounding trunk lid. In addition the Device will offer increased structural support to the present trunk lock mechanism making it more resistant to being tampered with.

2. The amended claim as submitted by the applicants and numbered "2" by the Patent Office Examiner read as follows:

An automobile trunk lock mechanism (anti-theft device) constructed of durable material which when fashioned over the lock housing, stem, and latch opening and used in conjunction with a pivoting lid prevents the unconventional entry and activation of the latch without the conventional use of a key.

Claim 3, apparently drafted by the Examiner. The Examiner simultaneously allowed the application and Claim 3 became, with no changes except the correction of several obvious typographical errors, the single claim of the patent as issued.[3]

Almost immediately after issuance of the patent on June 26, 1973, plaintiffs visited the four major automobile manufacturers and demonstrated their invention in an attempt to interest the manufacturers in rights under the patent.

On September 21, 1973, F. R. Austermann of Chrysler's Outside Suggestions Department, wrote plaintiffs to inform them that Chrysler was not interested in acquiring such rights because Chrysler "is introducing a latch protective device which has been under development for some time preceding even the filing date of your patent."

The earlier Chrysler development work which was referred to included a proposal by one of its engineers, C. R. Nash, in a memorandum dated May 20, 1971. Nash proposed enclosing the lock stem in a rigid metal tube whose outer end was force fitted over the lock body and whose inner end was interlocked with the inner panel on which the latch was mounted. This arrangement not only shielded the slot in the latch from outside access but reinforced the lock against either being punched in or pulled out of the outer panel of the lid, or rotated bodily relative to the lid.

While this structure was obviously practical, Chrysler did not adopt it for commercial production, but instead went to a simpler and less expensive variation in which a tubular metal sleeve was positioned around the lock stem, with its inner end secured to the inner panel of the lid and its outer end surrounding but not touching the lock body. Production drawings showing this construc-tion were made commencing in April 1973, before plaintiffs had disclosed their device to Chrysler.

General Motors developed a still simpler device to accomplish the same result: a washer mounted on the lock stem.

In March 1975, plaintiffs discovered a Dodge Charger incorporating one of the tubular metal sleeves described above. This action resulted.

## INFRINGEMENT

The only portion of the patent claim as to which there is any dispute respecting its applicability to the accused Chrysler device is the portion which calls for ". . . a sleeve *mounted on the rear of the* [lock] *housing* . . ." (emphasis added).

Chrysler argues that because its sleeve admittedly does not even touch the lock housing, it is not "mounted on" the rear or on any other part of the housing. Insofar as literal readability of the claim language on defendant's structure is concerned, the Court is compelled to agree. Plaintiff's argument that the word "mounted" does not require direct contact because a rider can properly be said to be "mounted" on a horse even if a saddle is interposed between them is not persuasive. The rider is nevertheless supported by the horse. In defendant's device, the sleeve is not supported directly or indirectly on the lock housing, but on the inner panel. Although the inner panel and the outer panel are secured together, and although the outer panel supports the lock, the sleeve is not "mounted on" the lock any more than a man standing on the ground alongside a horse can be said to be "mounted on" the horse because both the man and the horse are supported by the ground.

---

**3.** Claim 1 (the only claim) of the patent reads as follows:

An automobile trunk lock mechanism for a pivoted lid on an automobile provided with a cylinder lock, a lock housing and a latch mechanism mounted on the exterior of said automobile to lock said pivoted lid, a stem extending from the lock to an opening in the latch mechanism wherein rotation of said lock and stem releases said latch mechanism, the improvement comprising, a sleeve constructed of a durable material mounted on the rear of the housing incasing said stem and the opening in said latch mechanism, whereby said sleeve prevents access by unconventional entry around said lock housing to said stem and said opening to operate the latch.

Plaintiffs further argue that, even in the absence of literal infringement, the claim is infringed under the doctrine of equivalents. Chrysler counters that resort to that doctrine is foreclosed by file wrapper estoppel. The Court concludes that in this respect plaintiffs are correct.

Under the doctrine of equivalents, a claim which is not literally readable on the accused device may still be infringed if the accused device "performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). Here the Chrysler lock performs substantially the same function (blocking access to the slot in the latch) in substantially the same way (by means of a tubular metal member surrounding the lock stem with its inner end abutting the outer surface of the latch) to obtain the same result (preventing extension of a screwdriver through a punched hole in the outer panel of the trunk lid and insertion of its tip into the slot in the latch).

Defendant, however, argues that resort to the doctrine of equivalents is foreclosed by the countervailing doctrine of file wrapper estoppel. Under the latter doctrine, a patentee whose claims were rejected as unpatentable over prior art and who thereafter amended his claims to restrict their scope and obtain their allowance is estopped to contend that the claims should be interpreted as broadly as if the narrowing amendment had not been made. *Graham v. John Deere Co.,* 383 U.S. 1, 33–34, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Exhibit Supply Co. v. Ace Patents Corp.,* 315 U.S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736 (1942); *Cohn v. Coleco Industries,* 558 F.2d 53, 58 (2d Cir. 1977). Such an estoppel arises not only where existing claims are amended to add elements or limitations, but also where claims which have been rejected on prior art are cancelled, leaving only narrower claims. *Capri Jewelry v. Hattie Carnegie Enterprises,* 539 F.2d 846, 851 (2d Cir. 1976).

In the latter case, the claims remaining after the amendment are compared with the cancelled claims and the elements or limitations which appear in the remaining claims but not in the cancelled claims are treated as critical to patentability.

But an estoppel does not arise where, as here, the amended or cancelled claims were rejected as indefinite or unstatutory—that is, as failing to comply with 35 U.S.C. § 112. *Sears, Roebuck & Co. v. Jones,* 308 F.2d 705, 707 (10th Cir. 1962); *Hunt Tool Co. v. Lawrence,* 242 F.2d 347, 353 (5th Cir. 1957); *Peterson Filters & Engineering Co. v. Eimco Corp.,* 155 U.S.P.Q. 89, 97 (D. Utah 1967).

"Additions made for the purpose of clarity and definiteness, however do not create an estoppel. Nor will file wrapper estoppel be applied where the Patent Office's objections were based on the claims being unstatutory on their face." 4 Deller's Walker on Patents § 234, p. 90 (Ed. 19).

This exception is especially appropriate where, as here, the rejected claims consisted of nothing but functional statements with no recitation of structure. The substitute claim is thus entirely new; *all* of its elements and limitations were added simultaneously and it cannot be said that any particular features were conceded to be critical to patentability.

I therefore conclude that the patent claim, assuming its validity, has been infringed by the accused Chrysler trunk lock construction.

## VALIDITY

*The statutory presumption*

As in all patent infringement actions, we begin with the presumption that the patent in suit is valid, with the defendant having the burden of establishing its invalidity. 35 U.S.C. § 282.

The strength of this presumption depends, of course, on whether the Patent Office had before it at the time it granted the patent the most relevant prior art. If it did, the presumption is reinforced. *Ling-Temco-Vought, Inc. v. Kollsman Instru-*

*ment Corporation,* 372 F.2d 263, 268 (2d Cir. 1967). If it did not, the presumption is weakened or negated altogether. *Julie Research Laboratories, Inc. v. Guildline Instruments, Inc.,* 501 F.2d 1131, 1136 (2d Cir. 1974); *Lorenz v. F. W. Woolworth Co.,* 305 F.2d 102, 105 n.7 (2d Cir. 1962).

*The prior art*

The principal item of prior art relied on by Chrysler in attacking the validity of the patent in suit is the 1926 Pinkerton U. S. patent No. 1,575,501 which discloses an automobile lock which actuates both the ignition circuit and a hood latch. The lock body is mounted on the instrument panel and its cylinder is connected through an elongated stem extending downwardly and forwardly through the floor board to an ignition switch and hood latch mechanism under the hood. To prevent access to the lock stem in the space between the back of the instrument panel and the floor board, the stem is enclosed in a fixed tubular casing which is described as "preferably a heat treated style tube of sufficient hardness to safeguard the same against mutilation by sawing or other ordinary instruments."

The only reference cited by the Patent Office in rejecting the claims of the application for the patent in suit is the 1939 Miller U. S. patent No. 2,218,683 which discloses an automobile hood latch likewise actuated by a cylinder lock mounted on the instrument panel. The lock stem similarly extends from the lock cylinder forwardly through the "dashboard" or firewall to the latch mechanism beneath the hood. Throughout the space between the instrument panel and the firewall the lock stem is enclosed in a tubular sleeve which obviously has the effect of preventing access to the lock stem, although the patent does not specifically mention such a purpose. Possibly Miller thought this function superfluous, since he stated at page 3, column 1, lines 17–23 of his specification:

"In view of the fact that the lock 46 is mounted through the instrument board, access to it will be prevented when the door of the automobile is locked and unauthorized persons will be prevented from releasing and raising the hood sections even if they should have a key which will fit the lock."

But, whether or not Miller provided the sleeve for the express purpose of protecting the lock stem from tampering, it inherently performed that function, and the Pinkerton patent relied on by Chrysler cannot be said to be more relevant to the invention claimed by the Schimizzis than the Miller patent which was cited and considered during prosecution of the Schimizzis' application.

The 1922 Schonwald U. S. patent No. 1,408,477 on which Chrysler also relies, shows a cylinder lock in an entirely different environment: the wooden door of a building. The body of the lock is entirely enclosed within a cup which covers the front of the lock as well as its periphery and is provided in its outer face with an opening to receive the key, this cup being telescoped and threaded into a sleeve which extends from the inner face of the door. A lock stem of square cross section extends from the cylinder of the lock to the inner face of the door. No latch is shown and Schonwald refers to no particular type, but Chrysler suggests that the lock is designed to be used with a dead latch of the type shown in the 1916 Segal U. S. patent No. 1,188,846 which has a square opening for receiving a lock stem. In any event, it is clear that the stem is intended to project into the opening of some kind of latch. The telescoping sleeve obviously would have the effect of protecting the opening in the latch from access by the tip of a screwdriver. But this type of outside access does not appear to be a significant hazard. It would involve drilling a hole through the door. Because the lock body is of much larger diameter than those conventionally used on automobile trunk lids, and since the lock body extends within an inch or less of the inner face of the door, the hole would have to be drilled at a considerable angle relative to the axis of the lock stem, so that insertion of the tip of the screwdriver into the

opening in the latch and turning of the latch mechanism would be difficult if not impossible, particularly since it would involve twisting the inner end of the heavy, square-section stem while its outer end is held stationary by the lock cylinder.

Schonwald did not provide a protective enclosure around the lock to forestall any such access, but instead to prevent bodily rotation of the lock by means of a wrench. Thus, at page 1, line 105, he stated:

"In order to make clear the objects and advantages of the invention it should be explained that it is a comparatively easy matter for one who wishes to break a lock of this character to engage the face or cap of the cylinder 4 with a pair of heavy pliers, cutting away sufficient wood to give access thereto, and then to draw the cylinder out of the sleeve or barrel 6, and to then break the threaded lugs 16 or the screws 17, by which the cylinder is received to the inner face of the door by applying a pipe wrench or similar device to the cylinder and turning it."

 I conclude that neither Pinkerton nor Schonwald is more relevant than Miller. The presumption of validity thus remains intact. However, the presumption means no more than that reasonable doubts will be resolved in favor of the patentee. *Reeves Bros. Inc. v. U. S. Laminating Corp.*, 417 F.2d 869, 872 (2d Cir. 1969). The presumption need not be "accorded the weight of actual evidence" nor "affect a decision of invalidity that would otherwise be reached with confidence." *Lorenz v. F. W. Woolworth Co., supra*, 305 F.2d at 105.

### The differences between the patented invention and the prior art

Neither Miller nor Pinkerton nor Schonwald addressed the particular problem which was solved by the present patentees: preventing access to the slot in the latch of a trunk lid by the tip of a screwdriver inserted through a hole pierced in the outer panel of the lid. The latch means shown in both Miller and Pinkerton were so constructed and located that there was no problem respecting their vulnerability to re-

lease by insertion of a tool into the hood. The tubular sleeves of those patents merely prevented access to a lock stem located outside the hood, not to a latch slot located inside the hood.

### The obviousness of the invention

This brings us to the pivotal issue whether the claimed construction "would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103.

The procedure for resolving this issue was prescribed in *Graham v. John Deere Co., supra*, 383 U.S. at 17–18, 86 S.Ct. at, 694:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

While the Court referred to these indicia as "secondary considerations," Judge Learned Hand termed them the "signposts" of patentability and deemed them the most, if not the only, reliable evidence on the issue of obviousness.

In *Reiner v. I. Leon Co.*, 285 F.2d 501, 503–04 (2d Cir. 1960), he wrote:

"The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was,

or was not, 'obvious' is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant?"

And in *Norman v. Lawrence,* 285 F.2d 505, 506 (2d Cir. 1960), decided the same day, he added:

"It is true that courts have again and again evinced repugnance to recognizing as patentable a trivial readjustment of existing elements into a new combination, apparently insisting that monopolies should be limited to new assemblages of old elements that are important and imposing. That disposition will no doubt continue; it is hard to attach value to a trifling modification of a gadget that has arisen on the surface of a stream of novelties because it has found immediate favor. We can only reply that, while the standard remains what it is, we can see no escape from measuring invention in cases where all the elements of the new combination had been long available, (1) by whether the need had long existed and been desired, and (2) whether, when it was eventually contrived, it was widely exploited as a substitute for what had gone before."

The Supreme Court in *Graham v. John Deere, supra,* similarly recognized the distorting effect of hindsight in determining obviousness and the value of the objective factors referred to by Judge Learned Hand:

"These legal inferences or subtests do focus attention on economic and motivational rather than technical issues and are, therefore, more susceptible of judicial treatment than are the highly technical facts often present in patent litigation. See Judge Learned Hand in *Reiner v. I. Leon Co.,* 285 F.2d 501, 504 (2 Cir. 1960). See also Note, Subtests of "Non-obviousness": A Nontechnical Approach to Patent Validity, 112 U.Pa.L.Rev. 1169

(1964). Such inquiries may lend a helping hand to the judiciary which, as Mr. Justice Frankfurter observed, is most ill-fitted to discharge the technological duties cast upon it by patent legislation. *Marconi Wireless Co. v. United States,* 320 U.S. 1, 60, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943). They may also serve to 'guard against slipping into use of hindsight,' *Monroe Auto Equipment Co. v. Heckethorn Mfg. & Sup. Co.,* 332 F.2d 406, 412 (6 Cir. 1964), and to resist the temptation to read into the prior art the teachings of the invention in issue." 383 U.S., at 35–36, 86 S.Ct., at 703.

More recent Supreme Court decisions, however, have tended to derogate the role of the "secondary considerations" by indicating that they need not and should not be consulted if it can be otherwise determined that the invention is obvious.

In *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc.,* 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969), the Court stated:

"It is, however, fervently argued that the combination filled a long felt want and has enjoyed commercial success. But those matters 'without invention will not make patentability'. *A. & P. Tea Co. v. Supermarket Corp.,* 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162."

And in a dissenting opinion to the denial of certiorari in *Plantronics, Inc. v. Roanwell Corp.,* 429 U.S. 1004, 1008–09, 97 S.Ct. 538, 541, 50 L.Ed.2d 617 (1976), Justice White, joined by Justice Brennan, wrote:

"Although the Court has held that need, prior failure, and commercial success may, 'in a close case, tip the scales in favor of patentability,' *Goodyear Tire & Rubber Co. v. Ray-O-Vac Co.,* 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721 (1944), it has consistently and repeatedly rejected the claim that the standard of invention or nonobviousness can be satisfied solely by these 'objective' criteria. *Anderson's-Black Rock, supra,* at 61, 90 S.Ct. 305; *Great A. & P. Tea Co.,* 340 U.S., at 153, 71 S.Ct. 127; *Jungersen v. Ostby & Barton Co.,* 335 U.S. 560, 567, 69 S.Ct.

269, 93 L.Ed. 235 (1949). In *Graham v. John Deere Co., supra,* we reaffirmed and refined the basic test of patentability and firmly established the role of 'secondary' factors in the procedure for determining when the standard of nonobviousness is met: * * *.

* * * * * *

"Applying this test in *Graham,* we expressly rejected a claim that the secondary considerations could fill the void left by 'exceedingly small and quite nontechnical mechanical differences in a device which was old in the art'." *Id.,* 383 U.S. at 35–36, 86 S.Ct. 684.

This led the Court of Appeals for the Second Circuit in *Digitronics Corp. v. New York Racing Assn., Inc.,* 553 F.2d 740, 748–49, 193 U.S.P.Q. 577, 584 (2d Cir. 1977) to state even more specifically:

"Despite the persuasive advocacy of Judge Learned Hand, *Reiner v. I. Leon Co.,* 285 F.2d 501, 128 U.S.P.Q. 25 (2d Cir. 1960); *Lyon v. Bausch & Lomb Optical Co.,* 224 F.2d 530, 106 U.S.P.Q. 1 (2d Cir. 1955), this view does not represent current law. Any theory that 'secondary' considerations must be given weight before a determination of obviousness can be made was laid to rest in *Sakraida v. Ag Pro, Inc., supra,* 425 U.S. at 282–83, 96 S.Ct. [1532] at 1537. . . .

* * * * * *

"Only in a close case, in which application of the subjective criteria of nonobviousness in 35 U.S.C. § 103 does not produce a firm conclusion, can these objective or secondary considerations be used 'to tip the scales in favor of patentability'. *Roanwell Corp. v. Plantronics, Inc., supra,* 429 U.S. [1004] at 1006, 97 S.Ct. [538] at 541, 50 L.Ed.2d 617, 192 U.S.P.Q. at 66 (White, J., joined by Brennan, J., dissenting from denial of certiorari), quoting *Goodyear Tire & Rubber Co. v. Ray-O-Vac Co.,* 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721, 60 U.S.P.Q. 386, 388 (1944). Because we hold that the claims made here are clearly obvious, we need not examine secondary considerations."

If the issue of obviousness has indeed been determined before any consideration of the objective factors, it must have been resolved by weighing only the "background" elements referred to in *Graham* : the differences between the patented invention and the prior art and the level of ordinary skill in the art. It appears to this Court that these background factors merely *define* the issue by identifying the patentee's contribution to the art, and the level of ordinary skill against which the ingenuity of that contribution is to be measured. If that issue is finally *resolved* without even reaching the "secondary" considerations, that resolution must have been based entirely upon the Court's hindsight appraisal of the level of ingenuity involved in the conception of the invention.

Such a subjective approach seems far less reliable than objective evidence where it is available, particularly where that evidence bears directly on the issue of obviousness—for example, evidence as to what actual persons having ordinary skill in the art did or failed to do when they confronted the same problem in the course of their work. As I wrote for the Court of Appeals in *Timely Products Corp. v. Arron,* 523 F.2d 288, 294 (2d Cir. 1975):

"If the evidence shows that a number of skilled technicians actually attempted, over a substantial period, to solve the specific problem which the invention overcame and failed to do so, notwithstanding the availability of all the necessary materials, it is difficult to see how a court could conclude that the invention was 'obvious' to such persons at the time."

Fortunately, the decision of the present case does not require enlistment on either side of this philosophical conflict because there is no evidence here of trial and failure or of any other objective factors tending to establish patentability. Quite the contrary, what "signposts" there are point in the opposite direction.

■ Preventing the insertion of the tip of a screwdriver into the slot in the latch by interposing a barrier in front of the slot seems the simplest and most forthright ex-

pedient imaginable. If there could be a case in which a court, without reaching the secondary evidence, might properly conclude that the invention was obvious at the time it was made to persons having ordinary skill in the art,[4] this would appear to be such a case.

Such a conclusion is reinforced by the proof that others, confronted by the same problem at about the same time, readily and independently arrived at the same solution. The type of barrier chosen by General Motors was simplicity itself: a washer around the lock stem. Chrysler hit upon precisely the same type of barrier as the patentees—a tubular sleeve encircling the stem and abutting the outer face of the latch.

Such evidence of independent contemporaneous development, while not conclusive, is highly persuasive of the obviousness of the invention. *Felburn v. New York Central R. Co.*, 350 F.2d 416, 426 (6th Cir. 1965), *cert. denied*, 383 U.S. 935, 86 S.Ct. 1063, 15 L.Ed.2d 852 (1966); *Kaz Mfg. Co. v. Northern Electric Co.*, 412 F.Supp. 470, 483 (S.D.N.Y.1976); *Barr Rubber Products Co. v. Sun Rubber Co.*, 277 F.Supp. 484, 492 (S.D.N.Y.1967), *modified* 425 F.2d 1114 (2d Cir. 1970). Just as trial and failure may be the best evidence of nonobviousness, so may trial and success, at least where the same solution has been independently reached by a number of others almost immediately after the problem arose, be the best evidence of obviousness.

I conclude that the claimed invention was obvious at the time it was made to persons having ordinary skill in the art, and that the patent is invalid under 35 U.S.C. § 103.

It is therefore unnecessary to consider whether the patented combination demonstrates the synergism required by *Sakraida v. Ag Pro, Inc., supra*, 425 U.S. at 292, 96 S.Ct. 1532, 47 L.Ed.2d 784, *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., supra*, 396 U.S. at 61, 90 S.Ct. 305 and

*Digitronics Corp. v. New York Racing Association, Inc., supra*, 553 F.2d at 748–49. See also the dissenting opinion of Justice White in *Plantronics, Inc. v. Roanwell Corp., supra*, 429 U.S. at 1008–09, 97 S.Ct. 538.

The Complaint is dismissed.

SO ORDERED.

---

4. The evidence showed that a typical person working on lock designs in the automobile industry around 1970 had a degree in mechanical engineering with 8 to 10 years' experience in the field, with access to publications and to trade shows and other forms of communication relating to problems and current developments in vehicle security.